DECISION AND JUDGMENT ENTRY
{¶ 1} This is a consolidated appeal and cross-appeal from several Scioto County Common Pleas Court judgments in the action brought by Wells Fargo Financial Leasing Inc. (Wells Fargo), Assignee of Telmark LLC (Telmark), plaintiff below and appellant herein, against, inter alia, Douglas R. Gilliland and Penny Gilliland, defendants below and cross-appellants herein.
 {¶ 2} Wells Fargo assigns the following errors for review and determination:
FIRST ASSIGNMENT OF ERROR:
"THE JURY'S VERDICT IS INADEQUATE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED WHEN IT FAILED TO SUSTAIN PLAINTIFF-APPELLANT'S MOTION FOR DIRECTED VERDICT."
THIRD ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED BY FAILING TO SUSTAIN PLAINTIFF-APPELLANT'S MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT, OR, IN THE ALTERNATIVE, A NEW TRIAL AS TO DAMAGES ONLY."
 {¶ 3} Cross-appellants assign the following cross-assignment of error:
"THE TRIAL COURT ERRED IN OVERRULING APPELLEES/CROSS-APPELLANTS' MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT."
 {¶ 4} The Gilliland family has farmed in Scioto County for approximately one hundred fifty years. The family farm has passed from father to son for twelve generations. Adrian Gilliland apparently received the farm in 1956, and in 1994 he transferred it to his son, Russell Gilliland. A few years later, Russell began to show symptoms of Alzheimer's disease. In 1998, Russell transferred the farm to his son, Douglas Gilliland. Russell continued to help Douglas with day-to-day farming operations.
 {¶ 5} In February 2001, Russell contacted Telmark to inquire about financing a lease for a truck tractor and grain trailer.[1] Glenn Watts, a Telmark field representative, drove to Minford to discuss the matter with Russell and Douglas and to obtain credit information.[2] Douglas was approved for lease financing up to $25,000, but the equipment acquisition was never finalized.[3]
 {¶ 6} Russell later contacted Watts and told him that he and his son wanted to acquire a combine. Though Watts had no further personal contact with Douglas, in order to re-work the new leasing arrangement he requested, and received, additional financial information. Telmark pre-approved $27,000 in lease financing and, on April 14, 2001, Russell successfully bid on a "Holland TR-86" combine at auction.
 {¶ 7} Russell informed Watts of the acquisition and Watts, in turn, "FedExed" lease documents to Douglass for his signature. Douglas allegedly signed these documents and returned them to Telmark's corporate offices in Syracuse, along with a $2,770 advance payment. In addition to the advance payment, the lease provided for a $5,968 December payment followed by three annual $8,738 payments. The lease also contained a cognovit provision and clause which specified that if Telmark "deem[ed] itself insecure," it could accelerate the lease's terms.[4]
 {¶ 8} Although the lease documents were finalized, the Gillilands did not take possession of the combine. In August of that year, Telmark received a letter from Douglas to inform the company that he had "no knowledge" of the lease and did not authorize anyone to sign the lease in his name. Deeming itself insecure, Telmark exercised the lease's acceleration provision and demanded $32,182 in full payment. Douglas refused to comply with this demand.
 {¶ 9} Telmark commenced the instant action on September 29, 2001 and alleged that (1) Douglas had defaulted on the lease; and (2) the lease contained a "Warrant of Attorney with cognovit provisions" that authorized an attorney to appear on his behalf, waive service of process and confess judgment in Telmark's favor. Pursuant to the cognovit provision, Telmark caused to be filed on Douglas' behalf an answer that waived service of process and admitted default. A September 24, 2001 judgment awarded Telmark $32,182 in damages against Douglas Gilliland.
 {¶ 10} Less than a month later, Douglas filed a motion for relief from judgment and argued that he did not execute the lease, that his father forged his name on the instrument, that his father had no authority to sign the lease, and, in any event, his father lacked capacity to enter into a contract. Douglas's affidavit in support attested that he did not execute the lease and that he did not authorize anyone to sign on his behalf.[5]
 {¶ 11} Telmark's memorandum in opposition argued that the two men had a partnership and that Russell possessed the authority to execute the lease on his son's behalf. Watt's affidavit supported the memorandum and attested that he met both Gillilands to discuss the lease, that the discussion centered around "their" (the Gillilands) farming business, that the lease was mailed to Douglas at his last known address, and that Telmark received an executed lease.
 {¶ 12} After protracted discovery over Russell's competency to give deposition testimony, the matter came on for hearing. Douglas testified that although he met with Watts and considered leasing equipment, he ultimately decided against it because it would cost too much to maintain. Douglas stated that he did not execute the combine lease, that he did not give his father authority to execute the lease, and that he and his father were not business partners.
 {¶ 13} Russell admitted that he forged his son's name on the lease because he thought they "needed a combine." With respect to his Alzheimer's disease, a letter from Kevin W. Kammler, DO, revealed that Russell's mental status was evaluated in May 2000, a year before the lease was forged, and that he was diagnosed as suffering from "dementia" with profound effects on his mental status. Evidence also revealed that a guardianship was set up for Russell six months after this incident.[6]
 {¶ 14} On September 11, 2003, the trial court granted relief from the cognovit judgment. The court based its decision on the "interests of justice," as well as the fact that Telmark knew before it filed the complaint that Douglas was challenging his signature and lease obligations. Wells Fargo appealed and we affirmed that judgment on the basis that Douglas asserted a valid defense (forgery) and was entitled to Civ.R. 60(B)(5) relief. SeeWells Fargo Financial Leasing, Inc. v. Gilliland, Scioto App. No. 03CA2916, 2004-Ohio-1755.
 {¶ 15} On remand, Wells Fargo filed an amended complaint, named Russell Gilliland and his spouse, Penny, as defendants and raised five additional "claims." The new claims alleged that Russell perpetrated a fraud in signing the lease in his son's name, that the transaction unjustly enriched the Gillilands, that Russell should be estopped from denying liability under the lease, and that both Russell and Douglas made fraudulent conveyances of the family farm. These latter claims were based on the 1998 farm transfer to Douglas and the 2001 transfer to Penny (after the judgment in Telmark's favor).[7] Douglas and Penny denied liability. Sarah Gilliland, Russell's wife and guardian, answered on behalf of her ward and denied liability.
 {¶ 16} At the four day trial the parties essentially agreed that Russell signed Douglas's name on the lease.[8]
Considerable evidence was adduced, however, that Russell and Douglas, although not formal business partners, worked the family farm together and that Russell would incur expenses that Douglas would later pay, thus indicating an agency relationship. Glenn Watts, the only Telmark representative that had contact with the Gillilands, nevertheless admitted that no one told him that Russell and Douglas were partners or that one possessed the authority to act on the other's behalf. To the contrary, Watts explained that he understood that a "partnership didn't apply" and that Douglas was the sole party involved with the lease.
 {¶ 17} As to damages, Wells Fargo collection manager David Devancenzo testified that Wells Fargo was owed $36,117.06 under the lease.[9] He also stated that Telmark paid $27,700 to acquire the combine from Gary Worstell and later sold it for $14,000 in 2002.
 {¶ 18} At the conclusion of its case in chief, Wells Fargo moved to amend the pleadings to conform to the evidence adduced at trial. In particular, Wells Fargo sought to (1) add an additional claim that alleged an oral agreement between Douglas (through Russell as his agent) and Telmark to lease the combine[10] and (2) amend the promissory estoppel claim in its amended complaint to include Douglas as well as his father. After considerable discussion, the trial court permitted the amendments. Additionally, cross-appellants moved for a directed verdict on all the claims. The court, however, denied the motions.
 {¶ 19} The jury, after receiving voluminous instructions and sixteen interrogatories, concluded that: (1) as to claims against Russell Gilliland, the jury found for Russell; (2) as to the contractual claims against Douglas Gilliland, the jury found for Wells Fargo, but awarded the company neither compensatory nor punitive damages; and (3) as to the fraudulent conveyance claims against Douglas and Penny Gilliland, the jury found for Wells Fargo, but awarded no punitive damages.
 {¶ 20} Several days later Wells Fargo filed a motion for judgment notwithstanding the verdicts (JNOV) or, in the alternative, a motion for a new trial, on the damages issue. Wells Fargo argued that the jury's finding that Douglas was liable under the lease could not be reconciled with its decision to award zero damages. Douglas and Penny Gilliland also filed a motion for JNOV and argued, inter alia, that the responses to the interrogatories were contradictory and, in any event, no evidence was adduced to find that Douglas could be liable for breach of a contract.
 {¶ 21} On February 11, 2005, the trial court issued its judgment (1) that found Douglas breached the written lease and verbal agreement, but owed no damages to Wells Fargo; (2) in favor of Russell on Wells Fargo's claims for breach of the verbal and written lease agreement, as well as its claims for fraud; (3) in favor of Russell, but against Douglas and Penny, as to the fraudulent conveyance; and (4) ordered Penny Gilliland to quit-claim her interests in the family farm to her husband. Despite noting that it would address court costs at a later date, the court noted that the entry was a "final appealable order" and found "no just reason for delay." On the basis of that finding, Wells Fargo filed its first appeal (Case No. 05CA2993).
 {¶ 22} On May 10, 2005, the trial court overruled both JNOV motions, ordered the parties to evenly share court costs and found "no just reason for delay." Wells Fargo filed a second appeal (Case No. 05CA3006) and the Gillilands filed their notice of cross-appeal. On June 10, 2005, this Court we consolidated the appeals and cross-appeal.
 I {¶ 23} Before we address the merits of the assignments and cross-assignment of error, we must resolve some jurisdictional questions. Ohio courts of appeals have appellate jurisdiction over final orders. Section 3(B)(2), Article IV, Ohio Constitution. A final order, inter alia, affects a substantial right and in effect determines the action and prevents a judgment. See R.C. 2505.02(B)(1). If a judgment does not meet these requirements, an appellate court does not have jurisdiction to review the judgment and the appeal must be dismissed. See e.g.Prod. Credit Assn. v. Hedges (1993), 87 Ohio App.3d 207, 210,621 N.E.2d 1360 at fn. 2; Kouns v. Pemberton
(1992), 84 Ohio App.3d 499, 501, 617 N.E.2d 701.
 {¶ 24} The trial court's February 11, 2005 judgment was issued while both Civ.R. 50(B) motions were pending and Wells Fargo's Civ.R. 59 motion was pending. Thus, the entry was not a final appealable order and Wells Fargo's notice of appeal did not invoke the jurisdiction of this Court. See White v. Bozman's
(Dec. 18, 1995), Hocking App. No. 95CA9 (Civ.R. 50(B) motions); also see Tate v. Adena Regional Med. Ctr., 155 Ohio App.3d 524,801 N.E.2d 930, 2003-Ohio-App.3d 7042, at ¶ 14; Columbus v.Triplett (Dec. 14, 1999), Franklin App. No. 99AP-368(Civ. R. 59 motions). We also note that the entry postponed the court costs question. That postponement meant the entry did not "determine the action," for purposes of R.C. 2505.02(B)(1), and was neither final nor appealable. The court's inclusion of the Civ.R. 54(B) "no just reason for delay" language did not remedy the defect and, thus, Wells Fargo's notice of appeal was premature.[11]
 {¶ 25} However, the trial court's May 10, 2005 judgment resolved the pending motion for new trial, as well as the court costs issue. Although the counts set forth in the original complaint, the amended complaint and the amendments at trial often overlapped, we believe that the jury verdicts, either directly or indirectly, resolved the breach of contract claims, fraud claim, fraudulent conveyance claims and the promissory estoppel claims. The only arguable claim still pending, for unjust enrichment set out in Count V of the amended complaint, will not lie, because the subject matter of the claim is covered under an express contract. See Busch v. Premier Integrated Med.Assoc. Ltd., Montgomery App. No. 19364, 2003-Ohio-4709, at ¶ 107; Johnson v. Kappeler (Dec. 28, 2001), Miami App. No. 01-CA-26; Wild Fire, Inc. v. Laughlin (Mar. 9, 2001), Clark App. No. 2000CA51. In the case sub judice, we note that the jury found Douglas Gilliland liable under an express contract. Therefore, the jury could not have found Douglas liable on an unjust enrichment claim. This rendered Count V of the amended complaint moot for purposes of R.C. 2505.02. See e.g. GeneralAccident Ins. Co. v. Insurance Co. of America (1989),44 Ohio St.3d 17, 21, 540 N.E.2d 266; Wise v. Gursky (1981),66 Ohio St.2d 241, 421 N.E.2d 150, at the syllabus. For these reasons, we conclude that we have jurisdiction to consider the appeals and cross-appeal.
 II {¶ 26} We first address the cross-appeal. The Gillilands argue that the trial court erred in overruling their motion for JNOV. For the following reasons, we agree.
 {¶ 27} The standard for granting a motion for JNOV under Civ.R. 50(B) is the same used for granting a Civ.R. 50(A) directed verdict. Texler v. D.O. Summers Cleaners ShirtLaundry Co. (1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271;Wagner v. Roche Laboratories (1996), 77 Ohio St.3d 116, 121,671 N.E.2d 252, 256, at fn. 2. In other words, as long as substantial competent evidence supports the non-moving party, and reasonable minds could reach different conclusions about that evidence, the motion must be denied. See Strother v. Hutchinson
(1981), 67 Ohio St.2d 282, 284-285, 423 N.E.2d 467; Posin v.A.B.C. Motor Court Hotel, Inc. (1976), 45 Ohio St.2d 271, 275,344 N.E.2d 334.
 {¶ 28} In reviewing a motion for JNOV, courts do not consider the weight of the evidence or the witness credibility; rather, courts consider the much narrower legal question of whether sufficient evidence exists to support the verdict. See Fink, Greenbaum Wilson, Guide to the Ohio Rules of Civil Procedure (2001 Ed.) 50-8, § 50-5. Because this is a question of law, appellate courts conduct a de novo review. Randolph v. Fetty,
Lawrence App. No. 02CA9, 2003-Ohio-598, at ¶ 6; Krannitz v.Harris (Jan. 19, 2001), Pike App. No. 00CA649; Neal v. Blair
(Jun. 10, 1999), Lawrence App. No. 98CA37.
 {¶ 29} To properly evaluate the evidence, we must first frame the legal issues in this case. Despite a four day jury trial, a voluminous record, nearly nine hundred pages of transcript and sixteen jury interrogatories, the issue in this case is relatively simple — is Douglas Gilliland liable for the contractual obligations incurred by his father? We conclude, after our review of the record, that insufficient evidence exists to establish such liability.
 {¶ 30} The gist of Wells Fargo's claim(s) against Douglas is that Russell acted as Douglas' agent and bound him to the written lease agreement (or, in the alternative, a verbal rental agreement) for the combine. These claims are premised on the existence of an agency relationship between Douglas and Russell. To establish liability based upon an agency relationship, a plaintiff must show (1) the defendant made representations leading the plaintiff to reasonably believe that the would-be agent operated under the defendant's authority and (2) the plaintiff was induced to rely on the ostensible agency relationship to his detriment. Shaffer v. Maier (1994),68 Ohio St.3d 416, 418, 627 N.E.2d 986; also see Linder v. Am. Natl.Ins. Co., 155 Ohio App.3d 30, 798 N.E.2d 1190, 2003-Ohio-5394, at ¶ 24; National City Bank v. Schwiebert (Feb. 4, 2000), Fulton App. No. F-99-9; Pryka v. Medical Value Plan (Oct. 31, 1997), Lucas App. No. L-97-1108.
 {¶ 31} In the case sub judice, we believe that insufficient evidence exists to establish either factor. Although Wells Fargo presented evidence from which the jury could have found that Russell acted at times as his son's agent in operating the farm, no evidence exists to show that such representations were made to Telmark or to its employees. More importantly, no evidence exists to show that Telmark, or its employees, relied on any such representations. Only two people connected with Telmark/Wells Fargo, David Devancenzo and Glenn Watts, testified at trial. Devancenzo, the regional collections manager, testified solely to the amount due Wells Fargo. Nothing in his testimony established that he had any direct contact with Russell Gilliland or Douglas Gilliland. The only contact between the Gilliland family and Telmark occurred through Glenn Watts. His testimony on cross-examination reveals as follows:
"Q. When you were sitting down all the time with Russ and Doug did anyone ever say to you that they were partners?
A. No, in fact the opposite would be because it was my understanding that Russ was going to be the sole person on the lease so it would be an individual lease not a partnership lease.
Q. So in fact, [COUNSEL FOR RUSSELL AND SARAH GILLILAND] Excuse me, you mean Doug?
A. I'm sorry. Yes, I'm sorry. It was my understanding that Doug was going to be the sole person on the lease therefore partnership didn't apply.
 * * *
Q. Did Doug ever say that Russ had authority to sign his name?
A. No.
Q. So Doug never said it, Russ never said it, did either of them suggest in any way that they had authority to act on behalf of the other?
A. No.
 * * *
Q. You're not going to retract what you've told us already about Russ's authority or his lack of authority to sign documents in this case for Doug, are you?
A. I would not, it goes to the principal. If Doug's name was on the lease, Doug's signature needs to be affixed to the lease.
Q. Yet, there was nothing there that happened at Pendleton's that would have changed your mind about whether Russ, it was okay for Russ to sign Doug's name to anything?
A. Russ should not sign Doug's name to anything.
Q. You wouldn't have permitted that, even if you saw, even if Doug was there at Pendleton's and all three of you were there, you wouldn't have allowed Russ to sign Doug's name, would you?
A. No."
 {¶ 32} Thus, this testimony reveals that Douglas Gilliland did not represent to Telmark that his father was his agent and Telmark did not rely on any such representation. Indeed, this case is not about an agency, but rather about a man suffering from Alzheimer's disease forging his son's name to a contract.
 {¶ 33} We cannot say why the jury found Douglas liable to Wells Fargo. The sixteen jury interrogatories are confusing and, as the Gillilands suggest in their motion for JNOV, the jury appears to have given contradictory answers. In interrogatory number two, the jury answered "no" to the question of whether Watts believed Russell had authority to enter into a written agreement with Telmark on his son's behalf. Nevertheless, the jury answered "yes" to interrogatory number three that asked if Watts believed that Russell had authority to enter into a verbal agreement with Telmark.[12] The jury also answered "no" to interrogatory number five that asked if Russell bound Douglas to a verbal agreement with Telmark and then Douglas, subsequently, failed to comply with that agreement.[13] These answers appear to contradict the jury's verdict. Whatever the case may be, we find no evidence to establish that Douglas held his father out to Watts as his agent or that Watts, or any other Telmark representative, relied on any such representation.
 {¶ 34} Wells Fargo asserts that Douglas can still be held liable because the jury found that he was estopped from claiming that his father forged his signature. In particular, Wells Fargo points to jury interrogatories seven and eight in which they answered "yes" to the question of whether Douglas had both a duty and an opportunity to inform Telmark of the forgery and whether Telmark reasonably relied on his silence. Wells Fargo then cites the following language from Shinew v. First Natl. Bank (1911),84 Ohio St. 297, 95 N.E. 881, at the syllabus:
"One may by conduct, statements, or silence estop himself from claiming that his signature is a forgery; but before he can be estopped by mere silence facts must be alleged and proven showing a duty and opportunity to speak, that he knew or had reason to believe that the holder of the forged instrument would rely on his silence, and that the holder in fact did rely on his silence, and was in fact injured thereby."
 {¶ 35} Based on this holding, and the jury interrogatories, Wells Fargo claims that Douglas should be estopped from claiming that his father forged his name on the lease. We disagree.
 {¶ 36} First, although the jury found that Douglas had a duty to inform Telmark of the forgery, the jury did not expressly find that Douglas breached that duty. Second, to the extent the jury found that Douglas remained silent about the forgery after he discovered it, we believe that insufficient evidence supports this particular finding. Penny Gilliland testified that during the summer of 2001, her father-in-law made several vague references to farm equipment that needed to be picked up. She and her husband contacted an attorney to investigate the matter and, once they discovered the combine lease's existence, they immediately informed Telmark by letter, dated August 23, 2001, about the situation. Even if the jury did not believe her testimony, we find nothing in the record to prove that Douglas knew about the forgery sooner than learning the results of his own investigation.
 {¶ 37} Finally, we find no evidence in the record to show that Telmark relied to its detriment on Douglas's silence. The detriment incurred by Wells Fargo was its payment for, and acquisition of, the combine. Although it is not entirely clear from the record when that acquisition took place, copies of UCC forms introduced into evidence show that Telmark was listed as the lessor and Douglas was listed as lessee as early as May 29, 2001. Apparently, Telmark purchased the combine by that date and nothing in the record shows that Douglas was aware of the forgery at that time. Consequently, the jury could not have found that "Telmark was injured as a proximate result of [its] reasonable reliance" on Douglas's silence. Telmark was not injured, due to reliance on Douglas's silence, but rather by its reliance on a forged signature (of which Douglas did not have knowledge).
 {¶ 38} We emphasize that we are not holding that the jury's verdict was against the manifest weight of the evidence. Had Watts or anyone else from Telmark testified that Douglas held Russell out as his agent and the company relied on this representation, it would be up to the trier of fact to consider witness credibility and to weigh the evidence. In this case, however, no such evidence exists. To be sure, Wells Fargo adduced considerable evidence that Russell helped out with the farm and incurred other debt obligations on behalf of his son in the farm's day-to-day operations. However, we find no evidence to indicate that Glenn Watts was aware of this or that Telmark relied on an agency relationship. To the contrary, Watts testified that the company believed that it was dealing with Douglas only, and that Russell should not have signed his or his son's name to the lease.
 {¶ 39} For these reasons, we hereby sustain the cross-appeal's cross-assignment of error.
 III {¶ 40} Having sustained the cross-appeal, we hereby reverse the trial court's May 10, 2005 judgment insofar as it denied the Gillilands' motions for JNOV. Thus, judgment notwithstanding the verdict is hereby entered in favor of Douglas Gilliland on the breach of contract claim(s) brought against him by Telmark/Wells Fargo. The remainder of that judgment is affirmed. Because we find that Douglas cannot be held liable for breach of contract in the first place, Wells Fargo's assignments of error have been rendered moot and can be disregarded pursuant to App.R. 12(A)(1)(c).
 {¶ 41} Accordingly, the trial court's judgment is hereby reversed in part and affirmed in part consistent with this opinion.
Judgment Affirmed in Part and Reversed in Part.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed in part and reversed in part. Cross-appellants shall recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal and cross-appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, P.J. Kline, J.: Concur in Judgment Opinion.
[1] Wells Fargo acquired Telmark in 2003. Thus, we use "Telmark" to signify appellant for all proceedings prior to 2003 and use "Wells Fargo" to signify appellant in proceedings which occurred during 2003 and thereafter.
[2] Because Russell was retired from farming, and because Douglas was also employed full-time as a "pipe fitter" and had "off farm income," it was necessary to structure the transaction in Douglas's name.
[3] Russell negotiated for acquisition of the equipment and apparently could not come to terms with the seller.
[4] The transaction was structured as a "tax lease" which was explained as an arrangement whereby the asset was acquired and titled in the name of Telmark, but leased to the lessee (in this case, Douglas Gilliland). A Telmark representative explained that "80%" of its business transactions are structured as "tax leases."
[5] The evidence adduced at trial suggests that the forged lease's existence was discovered when Russell began to talk about the farm equipment he had purchased and how he and his son had to retrieve it. Douglas contacted his father's attorney for assistance to discover what exactly had happened. After it became apparent that his father had executed the lease, Douglas wrote Telmark in an attempt to amicably resolve the matter. Telmark did not respond to that letter.
[6] Although evidence was introduced to show that Russell was involved with some kind of equipment fire around the time of the combine incident, Gilliland family members explained that the forged lease prompted them to seek a guardianship. Douglas, in particular, testified that no "connection" existed between the equipment fire and the guardianship application.
[7] Sarah Gilliland, Russell's wife and Douglas's mother, testified that the purpose of the 1998 transfer was to preserve the property after his father's Alzheimer's disease diagnosis. Given that this occurred several years before the incident with the forged lease, it is unclear how Telmark considered that conveyance to be fraudulent. By contrast, Penny Gilliland admitted that Douglas conveyed the farm to her in 2001 in order to circumvent any attempt by Telmark to execute a future judgment against that property.
[8] No formal stipulation appears to that effect in the record. During opening statements, however, Wells Fargo's counsel repeatedly mentioned that "Doug knew . . . his father signed the lease agreement." Further, the trial court instructed the jury that "the parties agreed that Russ Gilliland signed Doug Gilliland's name to the lease with Telmark. No objection was lodged to that instruction and, thus, we presume the parties agreed on that point, notwithstanding the evidence Wells Fargo adduced that Douglas might have actually executed the lease.
[9] This sum included $32,182 in remaining rental payments, a "residual value" of $2,770 and $1,165.06 in interest.
[10] The oral contract claim was apparently separate and distinct from the written lease. According to arguments during a bench conference, the damages for breach of this oral contract would be the difference between the combine's $27,000 purchase price and the $14,000 recouped after its resale.
[11] See McCabe/Marra Co. v. Dover (1995),100 Ohio App.3d 139, 160, 652 N.E.2d 236; Cassim v. Cassim (1994),98 Ohio App.3d 576, 579, 649 N.E.2d 28; Palmer v. Westmeyer (1988),48 Ohio App.3d 296, 302, 549 N.E.2d 1202 A Civ.R. 54(B) finding of "no just reason for delay" does not make appealable an otherwise nonappealable order.
[12] It appears contradictory that, on one hand, the jury found Russell had no authority to bind his son to a written contract but, on the other hand, had authority to bind him to a verbal contract. Logic dictates that the representations would be the same and Russell either had no authority or possessed the authority to bind his son to both types of agreements.
[13] Jury interrogatory number five consists of a string of compound questions that asked (1) whether Russell bound Douglas to a terms of that verbal agreement, and (3) whether Telmark suffered damages as a result of that breach. Given that the jury returned a verdict that found for Telmark on the contract claim, but awarded no damages, we suppose that it is possible that the jury answered the first two questions in the affirmative and the last one in the negative, and therefore marked "no" for the entire interrogatory.