[Cite as *COD Properties Ohio, L.L.C. v. Black Tie Title, L.L.C.*, 2025-Ohio-2519.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

COD PROPERTIES OHIO, LLC,  :

    Plaintiff-Appellee,  :

                        No. 113730

    v.  :

BLACK TIE TITLE, LLC, ET AL.,  :

    Defendants-Appellants.  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
               AND REMANDED
**RELEASED AND JOURNALIZED:** July 17, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CV-19-917765 and CV-20-932386

---

### *Appearances:*

Harold Pollock Co., L.P.A., and Harold Pollock; Mark G.
Passannante, pro hac vice, *for appellee.*

Roetzel & Andress, LPA and David Sporar, *for appellants.*

LISA B. FORBES, J.:

{¶ 1} Appellants Black Tie Title, L.L.C. ("Black Tie" or "BTT"), Nicholas Varner ("Varner"), and Ryan Steigmeier ("Steigmeier") (collectively referred to as "Defendants" or "Appellants" at times) appeal the trial court's decisions on various post-trial motions and the denial of their motion for summary judgment. For the

reasons set forth below, we reverse the trial court's denial of Appellants' motion for judgment notwithstanding the verdict on COD Properties Ohio, L.L.C.'s ("COD") conversion claim. We also reverse the trial court's grant of COD's Civ.R. 60(A) motion, and accordingly, we partially reverse the trial court's award of attorney fees. The remaining assignments of error raised by Appellants are overruled. This matter is remanded for further proceedings consistent with this opinion.

## I. Background

{¶ 2} This case arises from a business arrangement between Black Tie and COD in which Black Tie agreed to attend residential foreclosure sales, also known as sheriff's sales, on COD's behalf and bid on properties offered for sale following foreclosure. Black Tie is owned by Varner and Steigmeier, with Varner serving as the managing member. Black Tie provides title and escrow services related to residential real estate transactions. COD was established by Christopher Ostlund ("Ostlund"), who is based in Oregon, for the purpose of purchasing foreclosed residential properties in Cuyahoga County.

{¶ 3} One specific transaction is at the heart of this dispute. On February 11, 2019, Steigmeier, in his position as an employee of Black Tie, attended the sheriff's sale for residential real estate located at 15508 Edgewood Avenue (the "Edgewood Property" or the "Property"). He won the bid and provided the sheriff's office with a $5,000 deposit check given to him by COD to secure the purchase. When he filled out the paperwork for the sale, he did so incorrectly. Instead of identifying COD as the purchaser using its exact business name registered with the Ohio Secretary of

State — COD Properties Ohio, LLC — Steigmeier wrote COD Properties, LLC. When it came time to prepare the deed, the sheriff's office titled the Edgewood Property in Steigmeier's name. Thereafter, Black Tie, Varner, and Steigmeier refused to title the Property in COD's name.

{¶ 4} On July 3, 2019, COD filed suit against Black Tie, Varner, and Steigmeier. The parties engaged in vigorous litigation. The following is a summary of the procedural history relevant to this appeal.

## A. Procedural History

{¶ 5} COD filed its fourth and last amended complaint on June 11, 2021, in which it raised 14 causes of action against Black Tie, Varner, and Steigmeier. Black Tie, Varner, and Steigmeier answered and filed counterclaims and a third-party complaint. The court appointed a receiver to take legal possession of the Property on December 23, 2021. In June 2022, the receiver transferred the Property to COD.

{¶ 6} On March 13, 2023, the trial court granted in part and denied in part Black Tie, Varner, and Steigmeier's joint motion for summary judgment on COD's claims against them. The court granted summary judgment on seven of COD's claims. However, the court denied the Defendants' motion for summary judgment on the remaining seven counts that alleged breach of contract, promissory estoppel, unjust enrichment, civil theft, conversion, conspiracy to commit conversion, and breach of fiduciary duties, finding that genuine issues of material fact existed for these counts, thereby precluding summary judgment.

{¶ 7} A trial commenced on March 27, 2023. The jury returned its verdict on April 4, 2023, as follows: in favor of Black Tie, Varner, and Steigmeier on COD's claim for conspiracy to convert; in favor of COD on its claim for breach of contract, awarding $555 in damages against Black Tie and $0 in damages against Varner and Steigmeier; in favor of COD on its claim for breach of fiduciary duty, awarding $30,000 against Black Tie and $0 against Varner and Steigmeier; in favor of COD on its claim for civil theft, awarding $35,000 in damages against Black Tie and $0 in damages against Varner and Steigmeier; and, in favor of COD on its claim for conversion, awarding $0 in damages. The jury found in favor of COD on each of Black Tie, Varner, and Steigmeier's counterclaims.

{¶ 8} In keeping with the trial court's bifurcation order entered prior to the commencement of trial, the punitive-damages phase of the trial followed immediately after the jury's verdict on the substantive claims. The jury awarded COD punitive damages for conversion and breach of fiduciary duty in the amounts of $1 each against Black Tie, Varner, and Steigmeier, on each count.

{¶ 9} By agreement, the parties submitted the issue of attorney fees to the court. A briefing schedule was set.

{¶ 10} Black Tie filed a motion for judgment notwithstanding the verdict on May 12, 2023. The trial court granted Black Tie's motion in part and denied it in part. The court granted judgment notwithstanding the verdict on the claim for punitive damages in connection with the finding of liability for conversion against Black Tie, Varner, and Steigmeier and for punitive damages against Varner and

Steigmeier related to breach of fiduciary duty because the jury had not awarded compensatory damages on those counts. The court denied the motion as it related to the award of $1 in punitive damages for Black Tie's breach of fiduciary duty, and the court denied the motion as it related to all remaining claims.

{¶ 11} On July 5, 2023, the court granted COD's motion for treble damages on its civil-theft claim. Pursuant to R.C. 2307.61, the trial court awarded COD a total of $105,000 in treble damages against Black Tie.

{¶ 12} The court granted COD's motion to assess court costs against Black Tie, Varner, and Steigmeier on December 29, 2023.

{¶ 13} By journal entry dated July 17, 2023, the court awarded attorney fees to COD and against Black Tie. The determination of the appropriate amount of attorney fees was reserved pending further briefing and evidentiary submissions. Hearings on attorney fees were held on August 3, 2023, and November 8, 2023. On February 12, 2024, the court awarded attorney fees in the total amount of $326,223.17, apportioned among three attorneys for their representation of COD.

{¶ 14} This appeal followed, with Black Tie, Varner, and Steigmeier raising the following ten assignments of error:

> 1. The trial court erred in denying Appellants' motion for summary judgment on COD's breach of fiduciary duty claim.
>
> 2. The trial court erred in denying Appellants' motion for summary judgment on COD's conversion claim.
>
> 3. The trial court erred in denying Appellants' motion for summary judgment on COD's civil theft claim.

4. The trial court erred in denying Appellants' motion for judgment notwithstanding the verdict on COD's conversion, civil theft, and breach of fiduciary duty claims.

5. The trial court erred in denying Appellants' motion for judgment notwithstanding the verdict on the punitive damages award in connection with COD's breach of fiduciary duty claim.

6. The trial court erred in granting COD's motion for attorney's fees.

7. The trial court erred in granting COD's motion for treble damages.

8. The trial court erred in granting COD's Rule 60(A) Motion to Permit Allowance of Additional Hearing Exhibit in support of its motion for attorney's fees.

9. The trial court erred in its assessment of COD's attorney fee award amount.

10. The trial court erred in its assessment of court costs against Appellants.

## B. Trial

### 1. Ryan Stegmeier

{¶ 15} COD called Steigmeier as if on cross-examination. Steigmeier testified that he was part of the team that launched Black Tie in 2018. Along with Varner, he was one of the principals operating the title company, which served two primary functions: title work and escrow services. Title work involved conducting title searches and clearing any existing liens to ensure that property could be transferred unencumbered. Black Tie also operated as a title insurance company, meaning it sold title insurance. Escrow work involved holding earnest money, and, as Steigmeier explained, "Escrow would pay any of the debtors or lien holders that would be owed money in the transaction." The escrow side of the business "would

entail the title company taking the money from the buyer or the buyer's lender, and paying the seller, and pay[ing] off any liens or encumbrances."

{¶ 16} Whenever Steigmeier attended sheriff's sales to bid on properties, he brought with him an email from COD containing a "bidder sheet" so he "knew what [he] was bidding on." He was unsure whether the bidder sheet identified the specific name of the company on whose behalf he was bidding. Steigmeier further stated that COD had provided him with more than one $5,000 check to use as a deposit in the event he was the successful bidder at a sheriff's sale.

{¶ 17} Steigmeier described a packet of documents related to the February 11, 2019 auction for the Edgewood Property. One of these documents — a "bidder information sheet" completed by Steigmeier — listed the purchase price as $35,000. On the line for "Purchaser/bidder/principal" is the name "Ryan O. Steigmeier." Steigmeier clarified that he acted as the bidder, while COD was the purchaser. In the section labeled "title name" is "COD Properties, LLC," in handwriting. According to Steigmeier, "It's the same thing I put on every other sheet."

{¶ 18} Steigmeier testified that approximately four to five months after successfully bidding on the Edgewood Property, he received a call from someone at the court informing him that he was in contempt of court. Although he could not recall the specific details of the conversation, it was during this call that he first learned the deed to the Edgewood Property was being issued in his personal name.

{¶ 19} The day after receiving that phone call, Steigmeier went to court seeking an explanation for why he was held in contempt and what steps were

necessary to resolve the issue. Afterwards, he visited the sheriff's office, where he unexpectedly encountered Ostlund from COD. The two men rode the elevator together and ended up in the sheriff's office at the same time. Steigmeier testified that he was angry at the time. He did not recall any of the conversations from that day, but he did remember going to court to "mitigate" the contempt finding so he "didn't have to buy a $30,000 house in Bedford Heights that [he] didn't want." Steigmeier did not recall any discussion with Ostlund that day beyond telling Ostlund, "Pay your bills."

{¶ 20} Steigmeier testified that although the deed for the Edgewood Property had been issued in his name, he had never received the physical deed. As he understood it, the property was deeded to him "because [Ostlund] didn't pay for the property for five months." Steigmeier denied that the deed was issued to him because the business name he had written on the bidder information sheet did not exist in Ohio, causing the sheriff to default to Steigmeier's name.

{¶ 21} The Property being deeded in Steigmeier's name was an error. To rectify that mistake, Steigmeier testified that his options were "pretty limited seeing as [he was] a partner in the title company." Consequently, Steigmeier and Varner contacted their lawyers to "let the pros work through it" and resolve the issue.

{¶ 22} Steigmeier maintained that he had "no idea" who eventually paid for the Property and that he did not investigate this issue.

{¶ 23} Steigmeier disagreed with the idea that the $5,000 deposit of checks provided by COD could create an escrow. He maintained that these checks "were

never held in escrow ever." Rather, they were kept in Steigmeier's car "above [his] visor." According to Steigmeier, in his dealings with COD, he was "acting in the capacity of a salesman trying to procure business doing a favor for somebody . . . [he] own[ed] half the title company . . . [he was] trying to create a relationship."

### 2. Nick Albano

{¶ 24} Nick Albano ("Albano") testified that at the time of trial he was working as a consultant for Ostlund Enterprises. COD was one the companies for which he did consulting work. To enter the Ohio market, Ostlund opened a new entity called "COD Properties Ohio, LLC" that "purchases flips [and] rentals in Ohio from auction." Albano was "in charge of the back end of things."

{¶ 25} Explaining the sheriff's sale process generally, Albano noted that participants must be physically present at the live auctions and bring deposit checks sufficient to meet the property's deposit requirement — typically in increments of $2,000, $5,000, or $10,000, depending on the appraised value.

{¶ 26} Albano himself had not bought properties at auction for COD. He explained that because COD was based on the west coast, it was not sustainable to fly in and out of Ohio for every auction, so they developed a relationship with Black Tie and Steigmeier to appear on COD's behalf.

{¶ 27} Albano was copied on an email sent from Daniel Vasquez ("Vasquez"), an employee of COD, to Steigmeier on December 23, 2018, the day before the first auction Steigmeier was to attend on behalf of COD. Attached to the email were three documents: a max-bid sheet, an LLC registration document, and an informational

sheet. Albano identified the "max bid sheet" as a document listing the properties COD was interested in at the auction, along with the maximum bid COD had authorized for each property. This was necessary because auctions move quickly, "so the person bidding on [COD's] behalf knows where to stop [bidding]." The LLC registration document was a certificate from the State of Ohio confirming COD's registration as an LLC in Ohio. Albano explained that "you cannot purchase a property in an entity name without it registered with the State of Ohio." He described the third document as "an informational sheet that we give to somebody appearing . . . for COD. That's all the information they need to make sure the property is deeded in the right name and contact information in case there's any notices sent by the court or the sheriff." Albano testified that "[Steigmeier] was supposed to send the auction receipt to us."

{¶ 28} Albano identified a bidder-information sheet from the December 24, 2018 auction. "COD Properties Ohio LLC" was handwritten on the line for "Title name."

{¶ 29} After that first auction on December 24, 2018, Varner, as one of the principals of Black Tie, sent an email to Ostlund, Albano, and others to ask how payments would be handled. He had heard that Steigmeier had gotten "a deal done at the auction." He wondered if "this arrangement is going to be ongoing."

{¶ 30} Albano testified that after the initial email related to the December 24, 2018 auction, typically COD continued to send Steigmeier max bid sheets to communicate to Steigmeier what properties to bid on and how much to bid. Albano

sent Steigmeier an email on December 31, 2018, with one attachment, a max-bid sheet, identifying properties COD was interested in and the maximum authorized bids for the next auction. Albano testified that he sent only the max-bid sheet because "we only buy in one name and [Steigmeier] already had the other documents for auction." Albano testified that Steigmeier never expressed any confusion about for whom he was buying properties.

{¶ 31} Albano identified another bidder-information sheet for a successful bid at auction on January 22, 2019. That form was filled out correctly in that it indicated the title should be prepared for "COD Properties Ohio, LLC."

{¶ 32} On February 11, 2019, Steigmeier attended the auction for the Edgewood Property and purchased it on behalf of COD. According to Albano, an issue arose with the purchase because "the incorrect information was put on the bidder [information] sheet for the entity name." On the line for the title name, the handwritten entry read, "COD Properties LLC/Ryan Steigmeier." Albano never had any communication with Steigmeier regarding this issue.

{¶ 33} Albano explained that before the deed to the Edgewater Property could be issued, the purchase price had to be paid. Accordingly, COD sent a check to the sheriff's office via FedEx. Albano became aware of the need to pay the purchase price after contacting the sheriff's office to inquire about the status of the transaction. The payment was sent before Albano learned that the deed had been issued in Steigmeier's name. Albano testified that he had expected the deed to be issued to COD.

{¶ 34} Albano reiterated that at the sheriff's sales held in December 2018 and January 2019, Steigmeier accurately identified the purchaser of the real estate as "COD Properties Ohio LLC."

{¶ 35} On cross-examination, Albano explained that when he first began working in Ohio on behalf of COD, he did not know that the completed bidder information forms were viewable on the court's docket. Albano was unsure whether he was aware, at the time the Edgewood Property was auctioned on February 11, 2019, that he could get bidder information by looking at the docket.

{¶ 36} Based on his due diligence and research, Albano learned that Ostlund had 30 days to make payment from the time a sale of a foreclosure property is confirmed by the court. To find out when the sale is confirmed, Albano could call the sheriff or look on the online docket. He was unsure whether he was aware of that in February 2019.

{¶ 37} With regard to the Edgewood Property, Albano testified that the remaining balance payment was not made within 30 days of confirmation. Albano did not know specifically who contacted the sheriff's office to ascertain the exact amount needed to pay off the Edgewood Property.

{¶ 38} Albano acknowledged that his responsibility was to track the deeds and ensure the property was successfully brought to market. Prior to COD's entry into the Ohio market, Albano conducted research on the sheriff's sale process in the state. He found the Ohio process to be generally ideal, because securing a property

at auction only required a down payment, rather than the full purchase price upfront.

{¶ 39} Steigmeier did not attend all auctions on behalf of COD. According to Albano, COD hired one other individual to attend sheriff's auctions on its behalf. That individual was hired through "Task Rabbit," which is an app through which a person can hire someone "sight unseen" to "do various things." The intent was for COD to use the app to hire someone to perform the same duties that Steigmeier had been performing.

### 3. Garth Swanson

{¶ 40} Garth Swanson ("Swanson") is a real-estate investor. He is familiar with Ostlund through his previous work at a fund where "Chris and Bulldog were our largest clients, purchasing properties at auction and refinancing them." Swanson testified that he had entered into a joint venture with Ostlund Enterprises, Inc. Pursuant to the agreement, Swanson provided the funds for the deposits required for COD to acquire properties at sheriff's sales. Swanson's role was strictly that of an investor, supplying capital. Two properties were purchased under the joint-venture agreement, and the Edgewood Property was one of them.

{¶ 41} Swanson met Steigmeier at the Black Tie offices while delivering checks to use when bidding on the properties. Swanson understood that Black Tie was bidding on properties for the joint venture. Swanson understood that the checks "would be kept safe there as in like an escrow." Swanson discussed with Steigmeier that Black Tie would do the bidding for them and "properties that we,

COD Properties Ohio, would take down or would sell [we] would use Black Tie for escrow services."

{¶ 42} Swanson brought five cashier's checks, each in the amount of $5,000, to the meeting at Black Tie. He handed the checks to Steigmeier, who assured him they would be kept "safe in-between auctions." Swanson identified a copy of one of the checks made payable to the Cuyahoga County Sheriff's Department. Having previously used title services, Swanson was aware of the fiduciary responsibility involved when handling other people's money. This, coupled with Steigmeier's reassuring words, left Swanson with the assumption that Steigmeier was acting as a fiduciary. Swanson stated that the cashier's checks represent "essentially cash" withdrawn directly from his bank account.

{¶ 43} On cross-examination, Swanson claimed there was a verbal agreement that Steigmeier would go to auctions and bid on properties on behalf of the joint venture. Swanson testified that he was aware that one of the $5,000 cashier's checks was used by Steigmeier for the Edgewood Property. The others were eventually collected when Steigmeier stopped doing anything for COD Properties.

{¶ 44} Swanson testified that the money to pay the sheriff for the balance on the Edgewood Property came from Swanson's father. He was aware that Black Tie had raised questions about the source of the funds used to pay the sheriff.

### 4. David Freeburg

{¶ 45} David Freeburg ("Freeburg") testified as an expert on behalf of COD. He is a title agent and an attorney.

{¶ 46} Freeburg described an "escrow transaction" as follows: the escrow agent gets a deed from the person selling the property, and the escrow agent gets the money from the person who is buying the property. The escrow agent swaps those, giving the deed to the buyer and the money to the seller. In short, the escrow agent facilitates the transaction.

{¶ 47} According to Freeburg, escrow agents owe duties to both parties for whom they are escrowing. Typically, the escrow agent has a contractual relationship with the party and owes fiduciary duties to the party. Fiduciary duties include, primarily, the duty to act in good faith, to follow the instructions of the party, and not to engage in self-dealing. According to Freeburg, any time you have an agency relationship, there is a duty of loyalty. An escrow relationship is a type of agency relationship. There is a principal who is directing and an agent who is taking directions. The agent has a duty to be loyal to their principal.

{¶ 48} While acknowledging that there was no written escrow agreement between Black Tie and COD, Freeburg opined, "Black Tie Title and its principals were acting as an escrow agent on behalf of COD." He testified that written agreements are for clarity and are not necessary to create an escrow relationship.

{¶ 49} More specifically, Freeburg gave his opinion that "an escrow agreement existed between Steigmeier, Black Tie Title, Varner, and COD Properties

for the expressed purpose of COD acquiring title to the property know as 15508 Edgewood Drive, Maple Heights." He based his opinion on the facts that Black Tie, Steigmeier, and Varner were delivered a check for the purpose of paying the deposit to the sheriff, along with instructions from COD to purchase the specific property.

{¶ 50} According to Freeburg, "as escrow agent, Black Tie Title, Steigmeier and Varner owed a duty of obedience to COD." He explained that, as escrow agent, these parties were required to follow COD's instructions as relates to the Edgewood Property transaction.

{¶ 51} Freeburg further opined that Black Tie, Steigmeier, and Varner owed a duty of loyalty, which includes refraining from self-dealing, and the duty to "obey the instructions that are given by the principal to the agent." That meant they were supposed to deliver the check, title the property in COD's name, and not title the property in Steigmeier's name.

{¶ 52} Freeburg expressed his opinion that, when Black Tie found the title was in Steigmeier's name, the proper response should have been for the agent — Black Tie, Steigmeier, and Varner — to deed the property to COD. According to Freeburg, Steigmeier should have immediately relinquished title to COD by executing a quitclaim deed. He was not aware of anything that would have prevented Steigmeier from doing so.

{¶ 53} According to Freeburg, it is common for funds used by an entity like COD to come from multiple parties. "The fact that funds don't necessarily come

from a COD bank account doesn't necessarily mean they aren't being directed from COD and it doesn't change my conclusion in relationship to this transaction at all."

{¶ 54} Freeburg concluded that Black Tie and its principals breached their duty to obey, testifying that the "escrow agent does not have the option to not follow instructions based upon the interest of an unknown, undisclosed third party." Freeburg further testified that "the possible existence of an undisclosed third party in not justification for an agent to breach their duty of loyalty, their duty of good faith, their duty to discharge the instructions provided by the principal."

{¶ 55} Freeburg understood that Black Tie, Varner, and Steigmeier's defense was based on concerns about the existence of a duty to the person who paid for the property. He did not agree that Black Tie had a duty to inquire about the relationship between COD and a third-party lender.

### 5. Christopher Ostlund

{¶ 56} Ostlund testified that COD purchases houses out of foreclosure and that his primary focus is assessing the value of the properties COD acquires and determining the markets into which the business expands. After COD purchases the properties, he collaborates with property managers who oversee their rental.

{¶ 57} The idea to come to Cleveland to operate his business was born in the fall of 2018. He became interested in Cleveland because of the large amount of foreclosure activity and the low bids he was seeing. COD had not yet been formed. To decide whether to enter the market in Cleveland, Ostlund started communicating

with local people in the market, from title companies to attorneys, learning the process of what he needed to know about working in Ohio.

{¶ 58} In October 2018, Ostlund met Varner, who he understood had a lot of experience in foreclosures, house flipping, and rentals. Varner was interested in growing his title business.

{¶ 59} Ostlund made arrangements with Black Tie to handle auction bidding for COD because it did not make sense to Ostlund to fly someone out from Oregon for every sheriff's sale. COD agreed to pay Black Tie a $125 trip charge and an additional $25 for each property Black Tie won at auction. Varner told Ostlund that Black Tie would invoice COD. Ostlund did not know who the specific person was who would be bidding at auction on behalf of COD. Varner told him it would be either Varner or one of his associates.

{¶ 60} After that arrangement was reached, Ostlund had cashier's checks delivered to Black Tie's offices, to be held there for future use to pay deposits at auctions. Ostlund instructed Varner to keep, for use at sheriff's sales, COD's certificate of registration with the Ohio Secretary of State's office. COD would always be the buyer. COD also provided general instructions regarding the conduct of an auction that would be the same from auction to auction.

{¶ 61} Ostlund described information provided to Black Tie before Black Tie attended its first auction on COD's behalf, reiterating earlier testimony that Steigmeier received three documents on December 23, 2018: the max bid sheet, the

LLC paperwork for Steigmeier to present when he won an auction, and an instruction sheet that described the auction process.

{¶ 62} Ostlund testified that in December 2018, Steigmeier purchased property at a sheriff's sale on behalf of COD. Ostlund confirmed that the bidder-information sheet listed "COD Properties Ohio LLC" as the entity to which the deed should be issued, with Steigmeier identified as the bidder.

{¶ 63} In January 2019, COD provided Steigmeier an updated address for COD. The new address was 7 St. Clair Avenue, Suite 450, Cleveland, Ohio.

{¶ 64} Before the auction for the Edgewood Property, COD had purchased approximately four or five houses in Ohio.

{¶ 65} Ostlund testified that, in his capacity as president of COD, he entered into a joint-venture agreement with Swanson dated January 23, 2019. Swanson agreed to provide capital to COD to purchase properties in Ohio.

{¶ 66} The purpose of the meeting with himself, Swanson, and Steigmeier at Black Tie's offices in early February 2019 was to talk about the process and to introduce Swanson. Swanson gave Steigmeier five $5,000 cashier's checks that were intended for use at future auctions. Ostlund understood the checks "were kept in a secure place in Black Tie." At the time of that meeting, COD was interested in purchasing the Edgewood Property that was going to be up for auction on February 11, 2019. Ostlund conveyed to Black Tie that COD wanted Black Tie to represent COD at the February 11, 2019 auction.

{¶ 67} On February 11, 2019, at 11:17 a.m., Steigmeier sent an email to COD informing it that he had won the auction for the Edgewood Property. Additionally, Steigmeier sent an invoice to COD for auction services.

{¶ 68} Ostlund testified regarding documents related to the Edgewood Property auction. He identified the cashier's check used to make the deposit on the Edgewood Property. The $5,000 cashier's check was dated January 30, 2019, and was made payable to the Cuyahoga County Sheriff.

{¶ 69} A document titled "Distribution of Sale Proceeds" identified "Ryan O. Steigmeier" as the purchaser of the Edgewood Property. After accounting for various fees and taxes, that document stated the total amount remaining to be paid for the Edgewood Property was $31,736.22. Ostlund testified that COD paid the balance due.

{¶ 70} The Sheriff's Report of Sale identified "Ryan O. Steigmeier" as the "highest and best bidder" for the Edgewood Property with the sum of $35,000. The address listed Steigmeier's address as "7 St Clair Cleveland, OH."

{¶ 71} Ostlund identified the bidder-information sheet for the Edgewood Property. On the line for "Title Name," in Steigmeier's handwriting, appears: "COD Properties LLC/Ryan Steigmeier." Ostlund testified that he does not have a company registered in Ohio with that name.

{¶ 72} On February 13, 2019, Varner emailed Albano, Ostlund, Vasquez, and Steigmeier. The subject line read, "Discontinuing Attending Auctions Moving Forward." The body of the email read, "Hi guys, we will no longer attend auctions

moving forward.  Please have someone pick up the remaining checks from our office or provide a mailing address to send the existing checks."  Ostlund had "no clue" as to why Varner sent that email; according to Ostlund, Varner "just decided not to do the work anymore at that time I believe."

{¶ 73} Ostlund responded via email later that day, saying that he had "talked with Ryan on what happened which is all good.  We will be lining up [a] guy to pick up checks on Friday which I will text Ryan the guys [sic] full name.  Thanks again for all your support and will be in touch soon."  When asked "what happened with Ryan," Ostlund testified, "Ryan just told me that they were just no longer — they were going to focus their time more on other things in their business."   Someone retrieved the unused deposit checks from Black Tie.

{¶ 74} Ostlund testified about email communications between himself and Steigmeier regarding Steigmeier's invoice for $600 for having attended auctions on behalf of COD.  Ostlund was willing to make the payment requested; however, he asked Steigmeier to complete a W-9 form for tax purposes before transmitting the check to Steigmeier.  Steigmeier declined to do so, instead informing Ostlund that he could "[k]eep the money."

{¶ 75} The process for making payment for a property once COD was deemed the successful bidder included "the $5,000 deposit down.  They receive it and then the next step is waiting for them to give you a confirmation . . . .  [W]ithout the confirmation of sale, you're never going to own the property."  According to Ostlund, sometimes it takes many months, even up to a year, before confirmation of sale is

received. When COD first started buying properties in Ohio in December 2018, "we didn't really understand. So that's why we had our legal team. . . [to] get as much expertise that we can in relying on your resources to help us."

{¶ 76} Ostlund never got the order of confirmation of sale on the Edgewood Property. Nonetheless, he did eventually pay the remainder of the purchase price. He could not recall how he knew to make the payment.

{¶ 77} COD had 30 days from the date of sale confirmation to provide the full purchase price. Ostlund explained that if this 30-day deadline is missed, "you go into contempt," the consequence being that "they take your deposit . . . so on the Edgewood . . . I would have lost my $5,000 deposit." Additionally, the property would be resold at auction. Concerning the Edgewood Property, Ostlund testified, "If they sell it and it goes over the bid, they're actually — the buyer actually gets extra money, so that money would have been went [sic] to Ryan." This was because, according to the sheriff's paperwork and court records, Steigmeier was the purchaser of the Edgewood Property.

{¶ 78} Ostlund testified concerning a motion for contempt filed against Steigmeier regarding the Edgewood Property. According to the motion and accompanying affidavit, the deed for the Edgewood Property had been "duly prepared and [was] ready for delivery" to Steigmeier; however, he "failed and refused to pay the aforesaid purchase price." A contempt hearing was set for June 10, 2019. By that date however, payment for the property had been completed.

As a result, according to a magistrate's order dated June 28, 2019, the motion and affidavit in contempt against Stegmeier were moot.

{¶ 79} According to Ostlund, COD had given Steigmeier explicit instructions that the Edgewood Property was supposed to have been titled, "COD Properties Ohio, LLC." Ostlund learned on June 21, 2019, that did not happen. He was on an elevator on his way to the sheriff's office to pick up deed receipts to properties other than the Edgewood Property. He encountered Stegmeier, who, according to Ostlund, would not talk to him. Ostlund said, "Hi." Steigmeier just looked down.

{¶ 80} According to Ostlund, when he and Steigmeier got to the clerk's counter, Steigmeier stated that he was there "for the 15508 Edgewood Drive property. I'm here to pick up a deed." Ostlund was confused. The clerk responded to Steigmeier, "'Yeah, the deed's been done. It's recorded.'" Ostlund was upset by what he heard. He was in shock. He testified that Steigmeier then said, "'That's awesome. I have it sold to another investor. I have it sold to another investor.'" According to Ostlund, he responded that the Edgewood Property was his and that Steigmeier had stolen it. Ostlund claimed he told Steigmeier that he needed to deed the Property back to COD. Steigmeier said nothing in response, he just left. Ostlund later testified that when he asked Steigmeier to deed the property over to COD, Steigmeier responded, "'No, we have it sold'" and then left.

{¶ 81} Ostlund testified that afterward he tried to contact Varner but Varner did not respond. He also contacted his attorney who sent an email to Black Tie asking them to return the Edgewood Property to COD. They did not. According to

Ostlund, eventually Black Tie told him that they would not give the deed to COD because, "It's not your money. Prove it. It's not your money."

{¶ 82} Approximately three years later, COD did get title to the Property. A receiver had been appointed over the Edgewood Property and that receiver sought and received court approval to effectuate the transfer. Ostlund identified a journal entry dated May 17, 2022, approving the transfer of legal title of the Edgewood Property to COD. The Edgewood Property was transferred to COD via a quitclaim deed dated June 28, 2022.

{¶ 83} Ostlund testified he had an escrow agreement with Black Tie.

{¶ 84} Ostlund testified that the delay in the payment of the purchase price for the Edgewood Property was caused by the fact that he did not know when the sale had been confirmed. Thus, although the auction was February 11, 2019, COD did not complete payment until June. He also verified that in responding to interrogatories, COD had responded that "[t]he reason for the delayed payment stems from the number of properties that COD was working to get funded and it was a matter of poor timing and funding availability or lack thereof."

### 6. Alnita Grant

{¶ 85} Black Tie called as its first witness Alnita Grant ("Grant") who works for the Cuyahoga County Fiscal Office in the Transfer Reporting Department. That department handles deeds, mortgage liens, and real estate transfers concerning real property in Cuyahoga County. Grant's job duties as a senior account clerk included processing documents such as deeds and conveyance forms.

{¶ 86} Grant explained that she is familiar with a form that is used to correct a deed previously recorded if there is a mistake or error on the recorded deed. For example, a legal description may need to be clarified or a name may have been misspelled. That form would be used and the transfer would be effectuated.

### 7. Valerie Pavlich

{¶ 87} Valerie Pavlich works for the Cuyahoga County Sheriff's Office. As of trial, she had been working there for at least 15 years.

{¶ 88} Pavlich testified that as of February 11, 2019, the information required on bidder forms included the date, the case number, the permanent parcel number, the amount the property was purchased for, the name of the bidder, and whatever the bidder wanted the title to read. If an LLC was involved, it would have to be registered with the State of Ohio. The purchaser fills out the part of the form identifying in whose name the deed should be prepared.

{¶ 89} Pavlich testified that it is her job to verify that any companies identified are registered with the State of Ohio. The bidder fills out the form while Pavlich confirms that the business entity is registered. If the business is not registered, the bidder can put their name down on the form. "If they do that and that happens, they can do a quitclaim deed. That cost $45 to do a quitclaim deed . . . and then they change it." Within a day or two of sale, the results of the sale will be posted on the internet.

{¶ 90} Pavlich confirmed that the handwriting on the bidder-information form for the Edgewood Property is not hers. According to Pavlich, where the form

asks for the Property to be titled to COD Properties, LLC/Ryan Steigmeier, "sometimes they're allowed to do that." The way the Edgewood Property bidder-information form was prepared indicates to her that she looked online, could not find COD Properties, LLC, and "Steigmeier put his name on there." Pavlich would only ask an individual to put their name on the form if she could not find the business entity existing in Ohio.

### 8. Nicholas Varner

{¶ 91} Varner testified on his own behalf and on behalf of Black Tie. He is the managing member of Black Tie. Black Tie was formed in 2017.

{¶ 92} Varner testified that he had never handled escrow for the sale of a foreclosure property purchased at sheriff's sale.

{¶ 93} Varner described his limited relationship with Ostlund and others at COD. He was introduced to Ostlund via email by an investor who would buy properties. In that email, the investor described Ostlund as "doing some business in Cleveland. Mostly buying at auction and he has a few questions for you." From October 2018 to February of 2019 when Varner cut ties with Ostlund and his group, Varner had met Ostlund three times and exchanged emails and a few phone calls. That was the extent of their relationship. Varner never met Albano in person but was on emails with him. He did come into contact with Vasquez who he understood to be Ostlund's State of Ohio manager.

{¶ 94} Varner explained that Ostlund indicated "he was going to buy the properties." It had not crossed Varner's mind that Ostlund was not going to use his

group's money to purchase properties at auction. Varner did not give Ostlund any information or advice regarding what properties to buy.

{¶ 95} Regarding his December 26, 2018 email to Ostlund and others, when Varner asked, "How are payments going to be handled?" he wanted to know "what level of requirement this was going to take from [Steigmeier]." It had been explained to Varner that what Steigmeier was being asked to do was "an extremely basic task that wouldn't take very long that you can handle outside of the day-to-day activities." Prior to meeting Ostlund, Steigmeier had no experience attending sheriff's sales. Varner did not pay close attention to the details of the relationship. He was not "aware of what LLC or bidder name they were working under."

{¶ 96} Ostlund sent Varner an email on February 2, 2019, regarding two properties – Fortune and Highland – transmitting a purchase and sale agreement. Varner met with Ostlund on February 3, 2019, and they went to look at those two properties. Varner testified that Ostlund "was hoping that I would buy these properties." Varner understood Ostlund to be asking if Black Tie would open up title and escrow. Upon reviewing the purchase and sale agreements, Varner understood that Ostlund was lining up prospective buyers and trying to get them to fund the balance of the sale to the sheriff directly. Black Tie did not open up title and escrow "[b]ecause it was clear to [Varner] that [Ostlund] did not own the properties and also [Varner] had no interest in doing anything that [he] perceived to be illegal real estate business."

{¶ 97} After reviewing the two agreements provided by Ostlund, along with a document outlining COD's business model, Varner concluded that "this was not something that I felt comfortable with at all. It was clear [Ostlund] was selling something he did not own." According to Varner, Ostlund was "trying to get prospective buyers to fund auction properties to pay the balance."

{¶ 98} Varner explained his reasoning behind sending the February 13, 2019 email ending the relationship between Black Tie and COD. Varner "didn't want anyone that I knew to be associated with that business model including myself, including [Steigmeier], anyone."

{¶ 99} Varner identified email correspondence from COD's lawyer to him, among others, dated June 21, 2019, demanding that Steigmeier title the Edgewood Property to COD. Varner responded that Steigmeier "is caught in the middle and has fiduciary obligations to preserve the transfer of the property on behalf of all persons and entities with the potential interest in the property." Varner went on to demand information from COD, including, but not limited to, "proof of every person and entity who paid and remitted purchase price including the down payment." Varner also demanded documentation authorizing Steigmeier to title the Property to COD, a resolution on behalf of every entity involved disclaiming interest in the Property, a written release and a hold harmless agreement indemnifying Black Tie "in the event that other parties with an interest in the [property] later challenge the transfer." Varner did not receive the information he had demanded. Varner wanted a court order from a judge and/or a receiver as to how the Property should be titled.

{¶ 100} On cross-examination, Varner agreed that there was no agreement for Steigmeier to take title to the Edgewood Property. At some point, Steigmeier told Varner that he had the deed to the property. According to Varner, Steigmeier never went to the sheriff's office to pick up the deed. "He went down there to get out of contempt of court." Varner understood that the deed had already been titled in Steigmeier's name.

{¶ 101} On June 21, 2019, Varner did not have any agreement regarding escrowing or sending any money to the sheriff to complete the purchase price on the Edgewood Property. Further, Steigmeier did not want the Property.

{¶ 102} Varner wanted the information he had requested from COD — the proof of who paid, the resolution, the release, and the hold harmless agreement — for his own protection, for Black Tie, Steigmeier, and himself and also "for the people who paid consideration." According to Varner, once the Property was titled into Steigmeier's name, "there was a responsibility to those whose money was put in consideration." That responsibility was Black Tie's, among others. Because this was an "outlier or random event," Varner contacted his attorney.

{¶ 103} Varner contended that Black Tie never had any escrow agreement with anybody with regard to the Property. Nonetheless, he maintained that Steigmeier had a "duty to step in and figure out whose money it was."

{¶ 104} The ownership of the Property went from the sheriff to Steigmeier, from Steigmeier to the Receiver, and then from the Receiver to COD. That last step occurred in June 2022.

### 9. Steigmeier on Direct Examination

{¶ 105} Steigmeier clarified that he had only attended sheriff sales on behalf of Ostlund/COD. On behalf of COD, Steigmeier bid on the "Morris property" and won the bid. When preparing the bidder-information sheet, he wrongly identified the entity for title as "COD Properties LLC." As was the case with the Edgewood Property, there was a problem with the Morris property being titled after Steigmeier won the bid on behalf of COD. That title was fixed; it is not in Steigmeier's name any longer. Steigmeier testified that he did not know that he was filling out the bidder information forms incorrectly.

{¶ 106} According to Steigmeier, he did not know there was a problem with the title to the Edgewood Property until he was held in contempt of court. Once he realized that, "we contacted our lawyers."

## II. Law and Analysis

### A. Final Appealable Order

{¶ 107} At the outset, we consider whether Appellants have presented a final appealable order under R.C. 2505.02 such that this court is vested with jurisdiction to review the present appeal. In response to this court's requested briefing on the issue, both COD and Appellants urge this court to find a final appealable order, which we do.

{¶ 108} The record reveals that COD's claims for promissory estoppel and unjust enrichment were not expressly resolved. The trial court denied summary judgment, finding genuine issues of material fact. At trial, the jury was instructed

on each of these claims and provided separate verdict forms for each of these claims. Consistent with the instructions they were given, the jury found Black Tie liable for breach of contract and they left the verdict forms for promissory estoppel and unjust enrichment blank. The journal entry memorializing the jury's verdict makes no mention of promissory estoppel or unjust enrichment. The journal entry does not include Civ.R. 54(B) language indicating that "there is no just cause for delay."

{¶ 109} This court has recognized that ordinarily, "[w]hen a court issues a judgment that disposes of some claims but leaves other claims pending, the order is final and appealable only if the judgment complies with Civ.R. 54(B)." *FedEx Corporate Servs. v. Brandes Internatl. Co.*, 2020-Ohio-3449, ¶ 11, fn. 1 (8th Dist.). However,

> "if the effect of the judgment as to some of the claims is to render moot the remaining claims or parties, then compliance with Civ.R. 54(B) is not required to make the judgment final and appealable." *Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.*, 44 Ohio St.3d 17, 21 (1989); *see also Wise v. Gursky*, 66 Ohio St.2d 241, 243 (1981) ("A judgment in an action which determines a claim in that action and has the effect of rendering moot all other claims in the action as to all other parties to the action is a final appealable order pursuant to R.C. 2505.02 and Civ.R. 54(B) is not applicable to such a judgment.").

*Id.; see also Ameritech Publishing, Inc. v. Mayo Bail Bonds & Sur., Inc.*, 2013-Ohio-831, ¶ 13 (6th Dist.) (finding a final appealable order without regard to Civ.R. 54(B) relief granted on breach of contract rendered moot claims for unjust enrichment and quantum meruit).

{¶ 110} It is well-settled that a finding of liability on a claim for breach of contract renders moot a claim for unjust enrichment or promissory estoppel. *See,*

*e.g., Gallagher Sharp. L.L.P. v. Miller Goler Faeges Lapine L.L.P.,* 2019-Ohio-3508, ¶ 19 (8th Dist.) ("Unjust enrichment is not applicable where an express contract exists."); *Graham v. Lakewood,* 2018-Ohio-1850, ¶ 59-61 (8th Dist.) (the existence of a valid and enforceable contract bars recovery under unjust enrichment or promissory estoppel); *Wells Fargo Fin. Leasing Inc. v. Gilliland*, 2006-Ohio-2756, ¶ 25 (4th Dist.) (where the jury found the defendant liable under an express contract, a claim for unjust enrichment would "not lie, because the subject matter of the claim is covered under an express contract" so that the unjust-enrichment claim was moot for purposes of R.C. 2505.02; finding a final appealable order).

{¶ 111} The jury's verdict finding an express contract that was breached rendered moot COD Properties' promissory-estoppel and unjust-enrichment claims. *See 12100 Buckeye Ltd. v. Council for Economic Opportunities in Greater Cleveland,* 2021-Ohio-4517 (8th Dist.) (recognizing that the existence of a contract between the parties bars recovery under a theory of promissory estoppel); *see also Digitalight Sys. v. Cleveland Clinic Found.,* 2022-Ohio-1400, ¶ 65 (8th Dist.) (recognizing that it is well settled that the existence of a valid contract between the parties bars recovery under a theory of unjust enrichment when the contract covers the same subject matter).

{¶ 112} Thus, the court's journal entry memorializing the jury's verdict resolved all of COD's substantive claims against Black Tie, Varner, and Steigmeier such that, once the issue of attorney fees was resolved, this matter was appealable pursuant to R.C. 2505.02. *See Rojas v. Concrete Designs, Inc.*, 2017-Ohio-379, ¶ 4

(8th Dist.) (noting that a final order under R.C. 2502.02 requires that the order "affects a substantial right in an action that in effect determines the action and prevents a judgment").

{¶ 113} Having determined this matter is properly before this court, we now consider Appellants' assignments of error, which we will, at times, address together and out of order for ease of analysis.

**B. Summary Judgment**

{¶ 114} In assignments of error Nos. 1, 2, and 3, Appellants argue the trial court erred when it denied their motion for summary judgment on COD Properties' claims for breach of fiduciary duty, conversion, and civil theft. We find no merit to these arguments.

{¶ 115} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law. *Id.* On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). A fact is material if it "'might affect the outcome of the suit under the governing law' of the case." *Oko v. Cleveland Div. of Police*, 2021-Ohio-2931, ¶ 23 (8th Dist.), quoting

*Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993). "A factual dispute is 'genuine' only if 'it allows reasonable minds to return a verdict for the nonmoving party.'" *Huntington Natl. Bank v. Blount*, 2013-Ohio-3128, ¶ 32 (8th Dist.), quoting *Sysco Food Servs. v. Titan Devs.*, 1995 Ohio App. LEXIS 4762, * 7 (9th Dist. Oct. 25, 1995).

{¶ 116} The Ohio Supreme Court has explained that

> [w]hile any error in the denial of a motion for summary judgment will often be rendered moot or harmless when the trial proceedings show that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion for summary judgment was made, . . . the denial of a motion for summary judgment is not harmless when the denial was predicated on a pure question of law.

*Bliss v. Manville*, 2022-Ohio-4366, ¶ 14, citing *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150 (1994), syllabus; s*ee also Batsche v. Batsche*, 2024-Ohio-1234, ¶ 13 (12th Dist.) ("[D]enial of summary judgment based on issues of material fact followed by a verdict in favor of the nonmoving party renders the denial of summary judgment moot or harmless . . . .  Errors in denying summary judgment that relate solely to legal questions, however, are reviewable.")  (Citations omitted.)

{¶ 117} As such, under long-standing and recently reaffirmed Ohio Supreme Court guidance, Appellants must demonstrate that the denial of summary judgment was predicated on a pure question of law to succeed in any of their first three assignments of error.  They have failed to do that here.

{¶ 118} To begin, the trial court explained in its judgment partially denying Black Tie, Varner, and Steigmeier's motion for summary judgment that "genuine issues of material fact remain, which preclude summary judgment" on COD

Properties' claims for breach of fiduciary duty, civil theft, and conversion.[1] Thus, the judgment shows that the case proceeded to trial on factual disputes, not legal ones.

{¶ 119} The parties' arguments and the evidence presented at the summary-judgment phase of these proceedings demonstrated that COD and the Defendants offered differing versions of the events at the heart of this dispute. For example, COD presented evidence in the form of Ostlund's testimony that when Ostlund went to the sheriff's office to pay the remainder of the purchase price for the Edgewood Property, he met up with Steigmeier who was there to collect the deed for the same property. At his deposition, Ostlund testified that Steigmeier told him that Steigmeier had sold the Edgewood Property to a third party and refused to make arrangements to turn the deed over to COD. On the other hand, Defendants presented evidence in the form of an affidavit from Steigmeier in which he asserted that he never claimed an interest in the Edgewood Property, that his name appearing on the deed was an innocent mistake, and that he was willing to retitle the property once he had a clear understanding of exactly who paid the remainder of the purchase price so that he could make sure the property was properly titled.

{¶ 120} COD's claims for breach of fiduciary duty, civil theft, and conversion all revolve around the questions of whether Steigmeier wrongfully used COD's $5,000 to bid on the Edgewood Property and then refused to turn over the Edgewood Property to COD and whether Appellants had sold the Edgewood

---

[1] Notably, the trial court did grant summary judgment in favor of Appellants on seven of the counts in the fourth amended complaint.

Property to a third party. The trial court correctly identified that disputed facts precluded an award of summary judgment.

{¶ 121} In light of the foregoing, Appellants' first, second, and third assignments of error are overruled.

## C. Judgment Notwithstanding the Verdict

{¶ 122} In assignments of error Nos. 4 and 5, Appellants argue that the trial court erred in denying their motion for judgment notwithstanding the verdict on COD's substantive claims of conversion, civil theft, and breach of fiduciary duty and on the award of punitive damages in connection with COD's claim for breach of fiduciary duty.

{¶ 123} Ohio's appellate courts review de novo a trial court's ruling on a motion for judgment notwithstanding the verdict, giving no deference to the trial court's decision. *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986); *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 2002-Ohio-2842, ¶ 4. A motion for judgment notwithstanding the verdict tests the legal sufficiency of the evidence. *Osler* at 347; *Goodyear* at ¶ 4. Without considering the weight of the evidence or the credibility of the witnesses,

> [t]he evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support [the nonmoving party's] side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied.

*Posin v. ABC Motor Court Hotel*, 45 Ohio St.2d 271, 275 (1976); *see also Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 2008-Ohio-3833, ¶ 22; *Trax Constr. Co. v. Reminderville*, 2021-Ohio-3481 (11th Dist.).

### 1. Assignment of Error No. 4 — Conversion and Civil Theft — Theft of Real Property

{¶ 124} Appellants argue that they were entitled to judgment notwithstanding the verdict because the civil theft and conversion claims against them were premised on the theft of real property. According to Appellants, neither conversion nor civil theft may, as a matter of law, be premised on the improper exercise of dominion or control over of real property.

{¶ 125} "Conversion is the wrongful control or exercise of dominion over the property belonging to another inconsistent with or in denial of the rights of the owner." (Cleaned up.) *Mathews v. Cooper*, 2021-Ohio-2768, ¶ 46 (8th Dist.). To establish a claim for conversion, "the owner of the property must show the following: (1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property; and (2) the possessor refused to deliver the property to its rightful owner." *Beavers v. PNC Bank, N.A.*, 2013-Ohio-5318, ¶ 29 (8th Dist.), citing *Pointe at Gateway Condo. Owner's Assn. v. Schmelzer*, 2013-Ohio-3615, ¶ 29 (8th Dist.), citing *Tabar v. Charlie's Towing Serv., Inc.*, 97 Ohio App.3d 423, 427-428 (8th Dist. 1994). In *Beavers*, this court concluded that "a claim of conversion must be based on the taking of identifiable personal property." *Id.*, citing *Landskroner v. Landskroner*, 2003-Ohio-5077 (8th Dist.).

{¶ 126} "To the extent that [Plaintiff] is asserting a claim of conversion of real property, her claim must fail because Ohio law does not recognize such a claim." *Id.* at ¶ 30, citing *Cleveland v. Sohio Oil Co.*, 2001 Ohio App. LEXIS 5192, *20-21 (Nov. 21, 2001); *see also STE Invs., L.L.C. v. Macprep, Ltd.*, 2022-Ohio-2614, ¶ 24 (6th Dist.).

{¶ 127} COD does not dispute that, under Ohio law, a claim for conversion cannot be based on real estate. Instead, COD responds that, as relates to its conversion claim, the jury awarded $0 in damages, even though it found Black Tie, Varner, and Steigmeier liable for conversion. According to COD, the matter is moot. We disagree.

{¶ 128} The sole case relied on by COD, *Ramadan v. MetroHealth Med. Ctr.*, 2011-Ohio-67 (8th Dist.), is inapposite. In *Ramadan*, the appeal specifically concerned the method of calculating damages. However, because the court determined that no damages had been awarded, the question of whether a particular item could be included in the calculation was rendered moot. In contrast, the issue in the present case is not about damages, but rather whether the finding of liability for conversion was appropriate. It was not.

{¶ 129} Here, the jury interrogatories make clear that COD's claim for conversion was based upon the alleged conversion of real property. As to each of the Defendants individually, the jury was asked, "Has plaintiff proved that it owned the Edgewood Property on June 21, 2019?" and then, "Has plaintiff proved

defendant [Black Tie, Stegmeier, or Varner] wrongfully exerted dominion over the Edgewood Property?"

{¶ 130} Because COD's claim for conversion was based on the alleged conversion of real property, we find that the trial court erred in denying Appellants' motion for judgment notwithstanding the verdict on each of COD's conversion claims.

{¶ 131} However, a claim for civil theft is not similarly limited to personal property. In its fourth amended complaint, COD sought to recover damages under R.C. 2307.61 which allows a property owner to bring a civil action to recover damages from any person who commits a theft offense under R.C. 2913.02. In turn, R.C. 2913.02 provides that

> [n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over . . . the property . . . (1) Without the consent of the owner or person authorized to give consent; (2) beyond the scope of the express or implied consent of the owner or person authorized to give consent . . . .

The Committee Comment explaining the 1974 enactment of R.C. 2913.02 states that "[t]heft of services and real property . . . are within the purview of the section." *See, e.g.*, *State v. Azir*, 2006-Ohio-5449 (8th Dist.) (concerning theft of real property).

{¶ 132} This court has recognized and upheld a claim for civil theft based on theft of a quitclaim deed. *See Dancybey v. Dancy-Dunlap*, 2022-Ohio-2774 (8th Dist.); s*ee also State v. Lenard*, 2018-Ohio-3365, ¶ 47-49 (8th Dist.) (upholding conviction for theft under R.C. 2913.02(A)(3) based on real estate transaction). In *Dancybey*, the plaintiff asserted a claim for deception pursuant to R.C. 2307.61,

among other grounds. The defendant had obtained a copy of a quitclaim deed in her name executed by her aunt and uncle for the limited purpose of providing her a place to live should they predecease her when she was young. *Id*. at ¶ 2. Defendant grew up, married, and moved away. *Id*. at ¶ 3. She found the deed years later, after her aunt had died. *Id*. Notwithstanding the fact that the limited purpose behind the quitclaim deed had long since passed, defendant recorded it with the county recorder unbeknownst to the uncle. *Id*. After her uncle moved from the house to a nursing home, defendant evicted her cousin who was living there. *Id*. The uncle sued and, after he passed away, his executor pursued the claim for civil theft based on theft of a real property interest. *Id*. at ¶ 4. Summary judgment was granted to plaintiff and upheld by this court; defendant was found liable pursuant to R.C. 2307.61. *Id*. at ¶ 1.

{¶ 133} Appellants rely on *Batsche*, 2024-Ohio-1234 (12th Dist.), to argue that a civil-theft claim cannot be based on theft of a real property interest. We are not persuaded. In *Batsche*, the court held that claim for conversion and civil theft based on allegedly improper withdrawals from two money management accounts were alternative claims. *See id*. It did not address real property.

{¶ 134} In accord with *Dancybey*, we find that a claim for civil theft can, as a matter of law, be premised on theft of an interest in real property, as was the case here. Consequently, we find that the trial court did not err in denying Appellants' motion for judgment notwithstanding the verdict as relates to Appellants' argument that civil theft may not, as a matter of law, be premised on the theft of real property.

## 2. Assignment of Error No. 4 — Conversion and Civil Theft — Intent to Deprive COD

{¶ 135} In support of their fourth assignment of error regarding civil theft, Appellants argue that the trial court erred when it denied their motion for judgment notwithstanding the verdict because at trial, "there continued to be no evidence that Appellants obtained or exerted control [over] COD's property with the 'purpose' of depriving COD of it." We disagree.

{¶ 136} Having determined that the trial court erred by denying Appellants' motion for judgment notwithstanding the verdict regarding COD's conversion claim, any further consideration of the evidence with regard to this claim would amount to an advisory opinion, which this court is prohibited from issuing. *See State v. Elston,* 2006-Ohio-3733, ¶ 5 (8th Dist.). We therefore decline to address Appellants' arguments regarding conversion further.

{¶ 137} To prevail on its claim for civil theft, COD needed to demonstrate by a preponderance of the evidence that Appellants willfully committed a theft offense as defined by R.C. 2913.01. *See Olive Oil, L.L.C. v. Cleveland Elec. Illum. Co.,* 2021-Ohio-2309, ¶ 28 (8th Dist.). R.C. 2913.01 defines "theft offense" to include a violation of R.C. 2913.02, which is the predicate offense alleged in COD's claim for civil theft. R.C. 2913.02(A) provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services . . . [w]ithout the consent of the owner or person authorized to give consent."

{¶ 138} Arguing insufficient evidence to support civil theft, Appellants point out that Varner and Steigmeier testified that it was a mistake for Steigmeier's name to appear on the deed for the Edgewood Property, that Steigmeier did not want the Edgewood Property, that Steigmeier did not intend to use it or rent it or sell it, and that Appellants were willing to change the name on the deed so long as COD disclosed who paid the balance on the purchase price. However, Appellants fail to recognize that Varner and Steigmeier were not the only witnesses to testify in this case and that other witness testimony suggests that there was intent to obtain or exert control over the property.

{¶ 139} Ostlund testified that on June 21, 2019, Steigmeier stated that he had already sold the property to another investor and refused to return the Property to COD. If believed, this testimony could demonstrate that Steigmeier's name on the title of the Edgewood Property was not an innocent mistake.

{¶ 140} The evidence at trial further demonstrated that title to the Edgewood Property was in Steigmeier's name from mid-2019 until June 2022, despite the fact that neither he nor Black Tie had paid the deposit or the balance due on the purchase price. Steigmeier understood that he was attending the auction on behalf of COD, that he was expected to use the $5,000 cashier's check for the deposit if he won the bid in accordance with COD's instructions, and that he was expected to identify COD as the entity in whose name the property should be titled. Ostlund and Albano testified that COD paid the balance due on the purchase price. While Defendants questioned whether it was truly COD who paid the balance on the Edgewood

property, the only evidence of third-party payment that the jury had before it was that Swanson's father gave money to COD and that COD eventually paid the purchase price. Though Steigmeier won the auction for the Property on behalf of COD on February 11, 2019, COD did not take possession of the Property until June 2022 when the receiver titled it to COD. The delay was caused by Defendants' refusal to act to correct the error when the Property was titled in Steigmeier's name rather than COD's.

{¶ 141} Looking at the entire record, and understanding that it is not our role to weigh witness credibility, we find the evidence, when viewed in the light most favorable to COD, is sufficient to support COD's claim for civil theft. We therefore find no error in the trial court's denial of Black Tie's motion for judgment notwithstanding the verdict with regard to the civil-theft claim.

### 3. Assignment of Error No. 4 — Breach of Fiduciary Duty

{¶ 142} Appellants argue that the evidence did not support COD's claim for a breach of fiduciary duty because COD never presented evidence that a fiduciary relationship existed. We disagree.

{¶ 143} Appellants specifically argue that "any fiduciary relationship must be mutual" and that here "the record simply did not bear that out." The only case relied on by Appellants for this proposition, *Tornado Techs. v. Quality Control Inspection, Inc.*, 2012-Ohio-3451, ¶ 26 (8th Dist.), found that an ordinary business relationship between an insurance agent and client did not rise to the level of a fiduciary relationship. In arriving at that conclusion, the court noted that "while the law has

recognized a public interest in fostering certain professional relationships, such as the doctor-patient and attorney client relationships," it has not recognized other relationships like the insurance agent-client relationship to be of similar importance. *Id.* at ¶ 27, citing *Rose v. Landen,* 2005-Ohio-1523 (12th Dist.).

{¶ 144} "A fiduciary relationship is one in which 'special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" *Hawes v. Downing Health Techs. L.L.C.,* 2022-Ohio-1677, ¶ 43 (8th Dist.), quoting *Stone v. Davis,* 66 Ohio St.2d 74 (1981) (no fiduciary relationship where parties negotiated an arms-length commercial transaction where the parties did not stand in a position of special confidence to one another); *see also In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115 (1974) (explaining that a fiduciary relationship is one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence acquired by virtue of this special trust").

{¶ 145} "A 'fiduciary' has been defined as 'a person having a duty, created by his undertaking, to act *primarily for the benefit of another* in matters connected with his undertaking.'" (Emphasis in original.) *Strock v. Pressnell*, 38 Ohio St.3d 207, 216 (1988), quoting *Haluka v. Baker*, 66 Ohio App. 308 (9th Dist. 1941). "A breach of a fiduciary duty claim essentially is a negligence claim involving a higher standard of care." *Hurst v. Entertainment Title Agency*, 2004-Ohio-2307, ¶ 39 (11th Dist.), citing *Strock* at 216. "Thus, the party asserting such breach must

establish the existence of a fiduciary duty, a breach of that duty, and an injury proximately therefrom." *Id.*

{¶ 146} We are mindful of our obligation, when reviewing the trial court's denial of a motion for judgment notwithstanding the verdict, to construe the evidence in the record "most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support [the nonmoving party's] side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Posin*, 45 Ohio St.2d at 275.

{¶ 147} In this case, the jury answered interrogatories that clarified the scope of the conduct at issue, finding Steigmeier liable for breach of fiduciary duties because he "caused title to the Edgewood Property to be placed in his name or thereafter withheld title for an extended time" and that Black Tie and Varner breached fiduciary duties when "defendant [Steigmeier] failed to cause title to be issued in plaintiff's name or thereafter withholding title for an extended time."

{¶ 148} The evidence presented at trial demonstrated that COD was dependent on Steigmeier to ensure that the Edgewood Property was titled in the name of COD. Steigmeier, while working for Black Tie, attended the sheriff's sale on behalf of COD. He understood that he was supposed to fill out the bidder-information sheet so that title would be issued in COD's name once the full purchase price had been paid. He understood that he was given the $5,000 deposit checks for use on behalf of COD if he won any of the bids.

{¶ 149} Further, Black Tie, Varner, and Steigmeier were obligated to correct any mistake in titling the properties purchased at sheriff's sale. That special trust and confidence to obey instructions and be loyal to COD was breached when Steigmeier prepared the bidder-information sheet in such a way that title was issued to him and then when Black Tie, Steigmeier, and Varner refused to correct the error in the title to the Edgewood Property. Absent Appellants fulfilling their duties, COD was powerless to effectuate the intended outcome — that the Edgewood Property be titled in COD's name. *See Burns v. Prudential Sec., Inc.*, 2006-Ohio-3550, ¶ 100 (3d Dist.) (finding breach of fiduciary duty where defendant took control of plaintiff's assets that gave rise to enhanced fiduciary duties, which were not met).

{¶ 150} As for mutuality, in his June 21, 2019 email to COD's lawyers, Varner explained that Steigmeier "is caught in the middle and has fiduciary obligations to preserve the transfer of the property on behalf of all persons and entities with the potential interest in the property." Given that Appellants were hired by COD to purchase the Edgewood Property at sheriff's auction, COD was one of the "entities with the potential interest in the property." In light of Varner's testimony at trial, it is difficult to see how Black Tie can argue at this juncture that there was no mutual understanding of heightened duties.

{¶ 151} Moreover, the evidence at trial demonstrated that Varner and Steigmeier operated Black Tie as a title and escrow company. They were, therefore, in a position to understand that it was their responsibility to ensure that title properly vested in connection with their work.

{¶ 152} Appellants noted that evidence was also presented that could be construed to support a finding that Black Tie and COD had an ordinary business relationship, not a fiduciary relationship. For example, Albano testified that COD used the Task Rabbit app to hire people other than Steigmeier "sight unseen" to perform the same duties that Steigmeier had been performing. However, reviewing the trial court's decision on judgment notwithstanding the verdict, we do not weigh the evidence, but simply assess sufficiency.

{¶ 153} Viewing the evidence most strongly in favor of COD, as we must, we find that evidence presented at trial was sufficient to demonstrate that a fiduciary relationship was established. The trial court did not err in denying Black Tie, Varner, and Steigmeier's motion for judgment notwithstanding the verdict on COD's claim for breach of fiduciary duty.

{¶ 154} For the reasons set forth above, Appellants' fourth assignment of error is sustained as relates to COD's claim for conversion but is otherwise overruled.

### 4. Assignment of Error No. 5 — Punitive Damages Based on Breach of Fiduciary Duty

{¶ 155} In Appellants' fifth assignment of error, they argue that their motion for judgment notwithstanding the verdict should have been granted on COD's claim for punitive damages because COD did not present evidence to support its claim for breach of fiduciary duty or of actual malice. Having found that the evidence in the record supported the finding of liability on COD's claim for breach of fiduciary duty,

we turn to whether COD presented sufficient evidence of actual malice on the part of Black Tie.[2]

{¶ 156} Pursuant to R.C. 2315.21, the burden of proof is on the party seeking punitive damages to demonstrate actual malice by clear and convincing evidence. "[A]ctual malice" is "(1) that state of mind under which a person's conduct is characterized by hatred ill will or a spirit of revenge or (2) a conscious disregard of the rights and safety of other persons that has a great probability of causing substantial harm." *Fowerbaugh v. Sliman*, 2022-Ohio-1314, ¶ 63 (8th Dist.); s*ee also Best Motors, L.L.C. v. Kaba*, 2025-Ohio-640 ¶ 86 (8th Dist.); *Preston v. Murty*, 32 Ohio St.3d 334, 335 (1987) ( "Actual malice can be placed in two general categories: first, behavior characterized by hatred, ill will, or a spirit of revenge and, second, extremely reckless behavior revealing a conscious disregard for a great and obvious harm."). "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful, or gross." *Burns*, 2006-Ohio-3550, at ¶ 103 (3d Dist.), citing *Columbus Fin., Inc. v. Howard,* 42 Ohio St.2d 178 (1975). "The purpose of punitive damages

---

[2] The jury initially awarded punitive damages against Black Tie, Varner, and Steigmeier on COD's claims for conversion and breach of fiduciary duty. The trial court granted judgment notwithstanding the verdict on all but the award of punitive damages against Black Tie in connection with the claim for breach of fiduciary duty because no compensatory damages were awarded against any defendant for conversion and no damages were awarded against Varner and Steigmeier for fiduciary duty. "A plaintiff must be awarded some measure of compensatory damages to receive punitive damages." *Niskanen v. Giant Eagle, Inc.*, 2009-Ohio-3626, ¶ 12; *see also* R.C. 2315.21(C)(2).

is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651 (1994).

{¶ 157} After the jury returned its verdicts on COD's underlying claims, the court took a short recess for lunch and reconvened to consider whether to award punitive damages. Counsel for COD stated that COD was not putting on any additional evidence regarding punitive damages, but requested an opportunity to argue actual malice. The court denied COD's request. The jury was instructed on punitive damages and returned a verdict in favor of COD, awarding $1 in punitive damages against Black Tie in connection with COD's claim for breach of fiduciary duty.

{¶ 158} Appellants argue there was "no evidence of actual malice at trial, let alone clear and convincing evidence of it." First, Appellants assert that because COD presented no evidence at the bifurcated punitive-damages phase, their claim for punitive damages must fail. We disagree.

{¶ 159} R.C. 2315.21(B)(1)(a) provides, that if the punitive-damages phase has been bifurcated, during the first compensatory-damages phase, "no party to the tort action shall present, and the court shall not permit a party to present, evidence that relates *solely* to the issue of whether the plaintiff is entitled to recover punitive or exemplary damages." (Emphasis added.)

{¶ 160} By its plain terms, R.C. 2315.21 does not, as Black Tie urges, disallow a party from presenting, in the initial phase, evidence necessary to establish liability simply because that same evidence also demonstrates actual

malice. *But see Root v. Stahl Scott Fetzer Co.*, 2017-Ohio-8398, ¶ 69 (8th Dist.) (stating that "R.C. 2315.21(B)(1) requires a trial court to bifurcate the compensatory and punitive phases of a tort action upon the motion of any party"). Moreover, Black Tie has not identified any evidence presented during the compensatory-damages phase on the grounds that it went solely to the question of actual malice, much less that such evidence has been wrongly admitted over Black Tie's objection.

{¶ 161} Black Tie next argues that there was no evidence of actual malice presented at the liability phase. Black Tie highlights that Varner and Steigmeier testified that the titling of the Edgewood Property in Steigmeier's name was a mistake, they did not want the Property, and they only declined to change the name on the deed out of concern that someone other than COD had paid for it and concern that such a transaction might implicate reporting requirements. Again, we disagree.

{¶ 162} Looking at the entirety of the record, we find that COD presented evidence that, if believed, could have been construed as demonstrating a conscious disregard to the rights of COD, which had a great probability of causing substantial harm to COD, and, hence, that Black Tie acted with actual malice. In particular, we note that Black Tie could have transferred the title to the Edgewood Property to COD for a mere $45 but refused to do so. Not until the receiver was appointed was the Property titled to COD, three years after the auction.

{¶ 163} Reviewing Black Tie's motion for judgment notwithstanding the verdict, we do not weigh the evidence. We assess sufficiency only, viewing the

evidence in the light most favorable to the nonmoving party, COD. Doing so, we find that the trial court did not err in denying Black Tie's motion. Appellants' fifth assignment of error is overruled.

### D. Treble Damages

{¶ 164} In their seventh assignment of error, Appellants contend that the trial court erred in granting COD's motion for treble damages under R.C. 2307.61, following the jury's determination of liability for civil theft. Our review of a trial court's decision to award or deny treble damages under R.C. 2307.61 is de novo. *Dancybey*, 2022-Ohio-2774, at ¶ 9 (8th Dist.), citing *X-Technology v. MJ Technologies, Inc.*, 2002-Ohio-2259, ¶ 13 (8th Dist.).

{¶ 165} Under R.C. 2307.61(A)(1)(a), a property owner who prevails in a civil theft action is entitled to recover compensatory damages equal to the "value of the property," plus additional damages calculated as a set amount based on that value. Alternatively, pursuant to R.C. 2307.61(A)(1)(b), the property owner may choose to forego compensatory damages and instead recover liquidated damages equal to either two hundred dollars or three times the "value of the property" at the time of the theft (i.e., treble damages), whichever amount is greater.

{¶ 166} A "[p]revailing plaintiff who has elected treble damages under R.C. 2307.61(A) is entitled to his chosen remedy." *Dancybey*, at ¶ 13; *see also Commonwealth Land Title Ins. Co. v. Choice Title Agency, Inc.*, 2012-Ohio-2824, ¶ 22 (9th Dist.) ("Once a plaintiff has prevailed on a claim under R.C. 2307.60(A)(1) . . . the remedy is . . . determined by the plaintiff's election.").

{¶ 167} In its motion for treble damages, COD requested the imposition of liquidated damages in the form of treble damages pursuant to R.C. 2307.61(A)(1)(b). The trial court granted this request, applying the treble damages provision to COD's $35,000 award, thereby entering a total civil theft damages judgment in the amount of $105,000.

{¶ 168} Appellants challenge the trial court's award of treble damages, asserting that such relief is limited to the theft of "goods" offered for sale by a "mercantile establishment" and, therefore, cannot be applied to real property. We are not persuaded.

{¶ 169} In support of their position, Appellants rely exclusively on R.C. 2307.61(H)(2)(a), which defines "value of the property" as "[t]he retail value of any property that is offered for sale by a mercantile establishment." However, Appellants' analysis fails to consider the remaining subdivisions of R.C. 2307.61(H)(2), which provide alternative definitions of "value of the property," including one that is expressly intended to encompass a broader range of property types. Subsection (H) provides:

(H) As used in this section . . . .

(2) "Value of the property" means one of the following:

(a) The retail value of any property that is offered for sale by a mercantile establishment, irrespective of whether the property is destroyed or otherwise damaged, is modified or otherwise altered, or otherwise is not resalable at its full market price;

(b) The face value of any check or other negotiable instrument that is not honored due to insufficient funds in the drawer's account, the absence of any drawer's account, or another reason, and all charges

imposed by a bank, savings and loan association, credit union, or other financial institution upon the holder of the check or other negotiable instrument;

(c) The replacement value of any property not described in division (H)(1) or (2) of this section.

{¶ 170} Subsection (H)(2)(c) serves as a catchall provision and applies to property not otherwise specifically addressed in subsections (H)(1) and (H)(2). This language is broad and inclusive, and nothing in the statutory text suggests an intent to exclude real property from its scope. To the contrary, the use of the term "any property" in (H)(2)(c) evinces legislative intent to encompass all forms of property not otherwise defined by the statute — including real property.

{¶ 171} Furthermore, R.C. 2307.61 provides a civil remedy for theft offenses under R.C. 2913.02. As discussed above in connection with Appellants' fourth assignment of error, R.C. 2913.02 applies to theft involving both real and personal property. Therefore, interpreting R.C. 2307.61 to allow recovery of treble damages for the theft of real property aligns with the statutory framework and its remedial purpose of offering a civil means to recover damages for acts that would otherwise constitute a criminal offense. *Accord Dancybey*, 2022-Ohio-2774 (8th Dist.) (acknowledging that civil theft claims and treble damages under R.C. 2307.61 may be pursued in cases involving theft of real property interests).

{¶ 172} Accordingly, the trial court did not err in awarding treble damages under R.C. 2307.61(A)(1)(b) for civil theft of real property. Appellants' seventh assignment of error is overruled.

### E. Assignment of Error Nos. 6, 8, and 9 — Trial Court's Decisions on Attorney Fees

{¶ 173} In their sixth, eighth, and ninth assignments of error, Appellants challenge various aspects of the trial court's award of attorney fees to COD. The determination of whether attorney fees are appropriate in a given case is a question of law, subject to de novo review. *See Southworth v. Southworth*, 2003-Ohio-4, ¶ 31 (8th Dist.). However, once it is determined that an award of attorney fees is proper, the amount awarded by the trial court is reviewed for an abuse of discretion. *See id.*

### 1. Assignment of Error No. 6 — Award of Attorney Fees

{¶ 174} In their sixth assignment of error, Appellants argue that the trial court erred as a matter of law in granting COD's motion for attorney fees. Under the "American Rule," attorney fees are generally not recoverable by the prevailing party in a civil action. *See Tinney v. Tite*, 2012-Ohio-2347, ¶ 20 (6th Dist.). "However, when punitive damages are awarded, attorney fees may also be awarded as a component of compensatory damages." *Kaba*, 2025-Ohio-640, at ¶ 88 (8th Dist.); *see Boaeuf v. Memphis Station, L.L.C.*, 2018-Ohio-745, ¶ 15 (8th Dist.) (an award of attorney fees is proper following the imposition of punitive damages).

{¶ 175} Here Appellants assert that because the finding of liability on COD's breach-of-fiduciary-duty claim was erroneous, the resulting awards of punitive damages — and by extension, the attorney fee award — were likewise improper. However, because we have already overruled Appellants' assignments of error relating to both the breach of fiduciary duty and the award of punitive damages, we

find no merit in this argument. As a matter of law, an award of punitive damages supports a corresponding award of attorney fees. Accordingly, we affirm the trial court's decision granting COD's motion for attorney fees. We overrule Appellants' sixth assignment of error.

### 2. Assignment of Error No. 8 — Civ.R. 60(A)

{¶ 176} In their eighth assignment of error, Appellants argue that the trial court erred in granting COD's Civ.R. 60(A) motion to supplement the record with exhibits supporting its attorney-fee request. The exhibits contained itemized time entries totaling $35,625 from H.P., one of COD's attorneys who handled specific aspects of the litigation. Civ.R. 60(A) provides:

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time on its own initiative or on the motion of any party and after such notice, if any, as the court orders.

{¶ 177} A trial court's ruling under Civ.R. 60(A) is reviewed for an abuse of discretion. *State v. Todd*, 2023-Ohio-4847, ¶ 15 (10th Dist.). An abuse of discretion occurs when the trial court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983)

{¶ 178} Appellants contend that the trial court abused its discretion by allowing COD to submit additional time entries after the attorney-fee hearing had concluded and the evidentiary record had closed. They argue that allowing the late

submission involved a substantive legal judgment, rather than a clerical correction permitted under Civ.R. 60(A). We agree.

{¶ 179} At the November 8, 2023 attorney-fee hearing, COD submitted billing records related to H.P.'s work but failed to include itemized time entries for the period from June 29, 2019, through December 31, 2020. Black Tie identified the omission during the hearing and cross-examined COD's expert witness, arguing that the requested attorney fees for that period lacked adequate support. Despite this, the trial court later granted COD's motion to supplement the record with the missing entries. While the omission of billing records by COD may have been inadvertent, we find that it does not constitute a "clerical mistake" correctable under Civ.R. 60(A).

{¶ 180} "The term 'clerical mistake' refers to an error or omission that is mechanical in nature, evident from the record, and 'which does not involve a legal decision or judgment.'" *Londrico v. Delores C. Knowlton, Inc.*, 88 Ohio App.3d 282, 285 (9th Dist. 1993), quoting *Dentsply Internatl., Inc. v. Kostas*, 26 Ohio App.3d 116, 118 (8th Dist. 1985). However, "[s]ubstantive changes in orders, judgments or decrees are not within its purview." *Musca v. Chagrin Falls*, 3 Ohio App.3d 192 (8th Dist. 1981), paragraph one of the syllabus.

{¶ 181} At the conclusion of the November 8, 2023 hearing, the trial court clearly stated on the record that it would not accept any further billing records from COD, except for those related to preparation for the fee hearing itself. This limitation was also set forth in the court's journal entry covering the November 8,

2023 hearing. By later granting COD's Civ.R. 60(A) motion and admitting new billing exhibits, the court effectively made a substantive change to the record. By allowing the record to be supplemented after the hearing, the court denied Black Tie any opportunity to examine that evidence, which was essential to that specific award of attorney fees. Not only was this not the type of clerical correction that Civ.R. 60(A) authorizes, it was fundamentally unfair.

{¶ 182} For these reasons, we find that the trial court abused its discretion by admitting the additional billing records after the close of the hearing. Without those records, the award of $35,625 is unsupported by the evidence and therefore must be deemed unreasonable. We, therefore, remand the matter to the trial court with instructions to vacate $35,625 from the total attorney fee award. Appellants' eighth assignment of error is sustained.

### 3. Assignment of Error No. 9 — Award of Fees

{¶ 183} In their ninth assignment of error, Appellants challenge the trial court's award of $326,223.17 in attorney fees to COD as the prevailing party. They assert that this amount is excessive or otherwise improper.

{¶ 184} When attorney fees are authorized by statute, the trial court has discretion to determine the appropriate amount to award. *See Est. of Shury v. Cusato*, 2024-Ohio-2066, ¶ 7 (8th Dist.), citing *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91 (12th Dist. 1985). An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable. *Id.*, citing *Blue v. Bur. of Workers' Comp.*, 2023-Ohio-3481, ¶ 10 (8th Dist.). A trial

court abuses its discretion when "'the amount of fees determined is so high or so low as to shock the conscience.'" *Alcorso v. Correll,* 2021-Ohio-3351, ¶ 43 (8th Dist.), quoting *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991).

{¶ 185} Appellants argue that the trial court erred by including in the overall attorney fee award, fees related to time entries not clearly tied to COD's breach-of-fiduciary-duty claim against Black Tie — the only claim that permits recovery of attorney fees in this case. In making this argument, Appellants concede that trial courts are not required to segregate fees between recoverable and nonrecoverable claims when such segregation is impractical, such as when the claims share a common core of facts or arise from related legal theories, making it difficult to allocate hours on a claim-by-claim basis. *See Cuspide Props. v. Earl Mech. Servs.*, 2015-Ohio-5019, ¶ 4 (6th Dist.). Appellants further acknowledge that in this case, the trial court did find that a common core of facts linked the claims and determined that the breach-of-fiduciary-duty claim was inextricably intertwined with the other causes of action asserted. Nevertheless, Appellants argue that the trial court's conclusion that the claims were too intertwined to allow for the separation of fees was not based on the existence of a common core of operative facts or closely related legal theories, but rather resulted from COD's counsel's failure to maintain clear and detailed time records. We find Appellants' argument to be circular in logic and ultimately unconvincing.

{¶ 186} Many of COD's attorney time entries were categorized by the legal task performed. These included entries such as "finalization of briefs for filing,"

"drafting reply to counterclaim," "drafting opposition to motion to show cause," and "preparation for contempt hearing," among others. While Appellants suggest that these entries should have been further broken down by time spent on each individual claim, we agree with the trial court's assessment that such further breakdown would have been impractical. As the trial court noted in its journal entry on attorney fees:

> Time drafting motions and attending court appearances that relate to multiple claims simply can't be separated into portions of time spent on each individual claim. Similarly, much of the discovery required in this case required discovery of facts relevant to most, if not all, of the claims in this matter.

In sum, the reason these time entries were not further segregated by claim is precisely because of the interrelated nature of the claims themselves. Accordingly, we find no abuse of discretion in the trial court's decision to include the fees associated with these time entries in the overall attorney fee award for breach of fiduciary duty.

{¶ 187} Appellants additionally argue as part of their ninth assignment of error that the $326,223.17 fee award for what was essentially a dispute over a $35,000 piece of property, is grossly excessive. We disagree.

{¶ 188} "'When ruling on a request for attorney fees, a trial court must determine the 'lodestar,' which is the attorney's reasonable hourly rate multiplied by the number of hours reasonably worked on the litigation.'" *Kaba*, 2025-Ohio-640, at ¶ 89 (8th Dist.), quoting *Scott v. First Choice Auto Clinic, Inc.*, 2023-Ohio-3855, ¶ 45 (10th Dist.), citing *Bittner*, 58 Ohio St.3d at 145. "'There is a strong

presumption that the lodestar amount is the proper amount for an attorney-fee award.'" *Id.*, quoting *Scott* at ¶ 45, citing *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 2020-Ohio-1056, ¶ 19.

{¶ 189} In determining attorney fees, courts consider a variety of factors beyond the lodestar amount. *Kaba* at ¶ 90. "These factors include the time and labor involved in litigation, the novelty and difficulty of the legal questions involved, and the results of the legal services." *Id.*, citing *Benton Village Condominium Owners' Assn. v. Holdings, JRG Ltd.*, 2024-Ohio-1990, ¶ 39 (8th Dist.).

{¶ 190} In support of its request for attorney fees, COD submitted billing records from three attorneys — G.G., M.P., and H.P. — each of whom contributed to various aspects of COD's case against Black Tie.

{¶ 191} Regarding the invoices submitted by G.G., the trial court found that he had billed a total of 2,060 minutes. Of that time, 120 minutes were determined to be unrelated to COD's breach-of-fiduciary-duty claim against Black Tie and were therefore excluded from consideration. The court concluded that the remaining 1,940 minutes were both reasonable and directly attributable to COD's claims. It also found G.G.'s hourly rate of $300 to be reasonable, based on his affidavit and the expert testimony presented during the attorney-fee hearing. Based on these findings, the court calculated a lodestar amount of $9,700 for G.G.'s services. Additionally, the court found no need to adjust this amount for factors such as the complexity of the issues or the labor involved.

{¶ 192} The trial court applied a similar analysis to both the M.P. and H.P. invoices. Regarding M.P., the court excluded charges it deemed nonrecoverable, such as travel expenses, time billed prior to his pro hac vice admission in Ohio, and work unrelated to COD's breach-of-fiduciary-duty claim. The court found M.P.'s hourly rate — initially $300, later increasing to $325 — to be reasonable, as well as the $95 hourly rate for paralegal services. Based on approved time entries and applicable rates, the court awarded COD $182,273.17 in attorney fees for the M.P. invoices. It concluded that no further adjustments to the lodestar amount were warranted.

{¶ 193} As for H.P., the court excluded 150 hours he had "estimated" for work performed between January 11, 2022, and November 4, 2022, finding them insufficiently supported. It also excluded 161.5 hours deemed unrelated to the breach-of-fiduciary-duty claim, and an additional 4.5 hours spent subpoenaing Black Tie's attorney and opposing a motion to quash, which the court found unreasonable. After these deductions, the court accepted 447.5 hours at a $300 hourly rate, resulting in a lodestar amount of $134,250.00. The court determined that no further adjustments to the lodestar amount were necessary.

{¶ 194} With the exception of $35,625 for work performed by H.P. in 2019, which was improperly awarded based on erroneously submitted evidence as determined in our analysis of the ninth assignment of error, we find nothing unreasonable or grossly disproportionate about the trial court's remaining attorney fee award of $289,598.17. As previously noted, this case was vigorously litigated by

both parties for over three years. In light of these circumstances, an attorney fee award of $289,598.17 does not shock the conscience. We find no abuse of discretion.

{¶ 195} Accordingly, Appellants' ninth assignment of error is sustained in part as it relates to the improper award of $35,625 stemming from the belatedly admitted invoices. The remainder of the assignment of error is overruled. We remand to the trial court with instructions to reduce the attorney fee award to $289,598.17.

### F. Court Costs

{¶ 196} In their tenth assignment of error, Appellants argue that the trial court erred by ordering them to pay all litigation costs, rather than dividing the costs between the parties. We disagree.

{¶ 197} Civil Rule 54(D) provides: "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs." Civ.R. 54(D) does not grant the prevailing party an absolute right to recover costs, rather, the rule affords the trial court discretion in determining how litigation costs should be allocated. *Naples v. Kinczel*, 2007-Ohio-4851, ¶ 3 (8th Dist.). A trial court's ruling on costs will only be reversed for an abuse of discretion. *Id.* at ¶ 7.

{¶ 198} Appellants contend that the trial court should have required each party to bear its own costs, asserting that many of the litigation expenses were unnecessary and resulted primarily from COD's conduct. According to Appellants, COD's actions were excessive, unwarranted, and often frivolous, which in turn

increased both the cost and complexity of the case. For example, they point to COD's repeated amendments to its complaint, its resistance to discovery, and its filing of numerous motions for sanctions against Appellants.

{¶ 199} However, the record reflects that both parties vigorously litigated this matter over an extended period. While Appellants challenge COD's conduct, they too filed a countercomplaint and multiple motions for sanctions. Given the nature and extent of the litigation on both sides, we find no abuse of discretion in the trial court's decision to award costs to COD as the prevailing party pursuant to Civ.R. 54(D).

## III. Conclusion

{¶ 200} For the reasons stated above, we affirm the jury's verdict and the trial court's post-verdict rulings on all assignments of error, with the exception of Appellants' fourth, eighth, and ninth assignments of error. Regarding the fourth assignment of error, we find that the trial court erred in denying Appellants' motion for judgment notwithstanding the verdict on COD's conversion claim, because real property cannot be the subject of conversion. As to the eighth and ninth assignments of error, we conclude that the trial court abused its discretion by admitting additional evidence of attorney fees after the fee hearing had concluded and by awarding $35,625 in attorney fees based on that improperly admitted evidence. Accordingly, we remand the matter to the trial court with instructions to

vacate the $35,625 attorney fee award based on the improperly admitted evidence and to reduce the total attorney fee award by this amount.

{¶ 201} Judgment affirmed in part, reversed in part, and remanded.

It is ordered that appellee and appellants share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MICHELLE J. SHEEHAN, P.J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS (WITH SEPARATE CONCURRING OPINION)

SEAN C. GALLAGHER, J., CONCURRING:

{¶ 202} I agree with the majority's decision, but I am compelled to write separately to address *Dancybey*, 2022-Ohio-2774 (8th Dist.), which relied on the county tax valuation as the "value of the property" for the trebling provision of R.C. 2307.61(A)(1)(b). It is conceivable that some may interpret *Dancybey* to authorize different valuations of real property for the purposes of recovery. Such an interpretation, however, would contradict statutory definitions, essentially defining the value of the real property for the purposes of the trebling provision as the

"replacement value" under R.C. 2307.61(H)(2)(c). A county tax valuation may not represent the replacement value of the real property and may not even accurately reflect the fair market value of that property. *Dancybey* did not address the definition of "value of property" as used in R.C. 2307.61, and therefore, the case should be limited to its holding that once the trebling provision becomes the elected remedy, the trial court must award treble damages. *Id.* at ¶ 14. I recognize that this is not the case to address my concern because the parties have not discussed it, but because *Dancybey* is applicable to the outcome, further clarification may be needed.

{¶ 203} "R.C. 2307.60 creates a civil cause of action for damages resulting from any criminal act, unless otherwise prohibited by law." *Jacobson v. Kaforey*, 2016-Ohio-8434, ¶ 13. The "plain language of the statute does not require proof of an underlying criminal conviction" in order to maintain and prove the civil cause of action. *Buddenberg v. Weisdack*, 2020-Ohio-3832, ¶ 11; *see also* R.C. 2307.61(G)(1). A plaintiff asserting a civil cause of action must demonstrate the criminal act and resulting damages. Under R.C. 2307.61(A)(1), the plaintiff may elect one of two measures of damage. They may recover "compensatory damages," which include "the value of the property and liquidated damages," of $50, $100, or $150 depending on the value of the property. R.C. 2907.61(A)(1)(a). If the value of the property is less than $50, then the liquidated damage is $50; if greater than $50 but less than $100, the liquidated damage is $150; and if greater than $150, the liquidated damage is capped at $150. In lieu of "compensatory damages," the plaintiff may elect to seek "liquidated damages" of either $200 or three times the

value of the property at the time it was damaged or the subject of a theft offense. R.C. 2307.61(A)(1)(b).[3]

{¶ 204} As the majority notes, the phrase "value of the property" as contemplated under R.C. 2307.61(A)(1)(b)(ii) is an expressly defined term of art. R.C. 2307.61(H)(2). It is defined as the "retail value of any property that is offered for sale by a mercantile establishment," the value of a check or other negotiable instrument not honored based on insufficient funds in the drawer's account, or "the replacement value" of any other property. *Id.*

{¶ 205} In *Dancybey*, the sole argument invoking R.C. 2307.61 was based on a trial court's decision declining to award treble damages under R.C. 2307.61(A)(1)(b)(ii). On that argument, it was concluded that once the plaintiff elects to pursue liquidated damages under the trebling provision, the trial court is required to award three times the value of the property upon a verdict in the plaintiff's favor. *Id.*, 2022-Ohio-2774, at ¶ 14. The panel issued a mandate to the trial court to enter a final judgment based on the "value of the property" derived from the county tax valuation. *Id.* at ¶ 25. Unfortunately, that conclusion was not

---

[3] This framework is curious to say the least. One cannot help but wonder why any aggrieved property owner would elect compensatory damages as established under R.C. 2307.61(A)(1)(a). The Hobson's choice to elect either $200 in liquidated damages under subdivision (A)(1)(b)(i) or the trebling provision under subdivision (A)(1)(b)(ii) will always yield greater monetary damages. The only exception to liquidated damages is contained in subdivision (F), but that exception limits recovery solely to the value of the property if the civil action is joined with an action for replevin under R.C. Ch. 2737. Even with the exception, the statutory choice seems simple: do not join the two actions. If not joined, treble damages remain available: the property owner may elect to recover "three times the value of the property . . . irrespective of whether the property is recovered by way of replevin or otherwise." R.C. 2307.61(A)(1)(b)(ii).

accompanied with any analysis as to whether a county tax valuation represents the "replacement value" of the property under R.C. 2307.61(H)(2).

{¶ 206} "Replacement value" is not expressly defined. The theft offense statutes contains some guidance. Under R.C. 2913.61(D)(3), the value of any real or personal property is the "fair market value" of the property, unless the personal property is an irreplaceable thing of intrinsic worth or retains substantial utility regardless of its age or condition. The value of personal property or a thing with intrinsic worth that is irreplaceable is the amount that would compensate the owner for the loss. R.C. 2913.61(D)(1). The cost of replacing personal property that retains substantial utility is the cost to replace with new property of like kind and quality. R.C. 2913.61(D)(2). The cost to replace value is similar to the "retail value" discussed in R.C. 2307.61(H)(2)(a).

{¶ 207} Unless deemed to be "an heirloom, memento, collector's item, antique, museum piece, manuscript, document, record, or other thing that has intrinsic worth to its owner" that is irreplaceable or replaceable only at great expense, the value of any other property, such as real property, is limited to its fair market value. The "fair market value," which is "the money consideration that a buyer would give and a seller would accept" for that property, thus differs from the "replacement value" under the civil recovery statute.

{¶ 208} A civil action for theft is predicated on a theft offense. One would think the value of the theft of real property would be tied to the theft offense itself, in that any civil recovery would be based on the value of the property as defined by

the theft statutes.  Nonetheless, the legislature has limited the civil recovery solely to the "replacement value" of real property because that property is not offered for sale by a mercantile establishment or a negotiable instrument.  What that means for the purpose of resolving a civil claim for theft of real property is open to discussion. Because *Dancybey* solely focused on the question of statutory construction with respect to mandating treble damages once elected, the case should not be read as defining "replacement value" under R.C. 2307.61(H)(2)(c).

{¶ 209} As mentioned by the majority, the appellants have not provided any analysis or discussion regarding the totality of the statutory language at issue.  Their sole argument focuses on R.C. 2307.61(H)(2)(a), which is essentially defining the value of personal property, and fails to discuss the impact of *Dancybey*.  That subdivision is not applicable to the claims for theft of real property, and without further analysis or discussion distinguishing *Dancybey*, there is no relief that can be offered.   Although *Dancybey* may need revisiting based on the foregoing observations, it is not an issue that can be resolved in this appeal.  For this reason, I otherwise concur with the majority.